## COMMONWEALTH *vs.* JOSEPH N. LANE.

A man who has been lawfully married in this Commonwealth, and whose wife has here obtained a divorce from the bond of matrimony for his adultery, (in which case he is prohibited by our statutes from marrying again without leave of the court,) and who, without having obtained leave of the court, and being still a resident of this Commonwealth, is married to another woman in another state according to its laws, and afterwards cohabits with her in this Commonwealth, the first wife being still alive, is not liable to indictment for polygamy here under the Gen. Sts. *c.* 165, § 4, without proof that the second wife was a resident of this Commonwealth, and that he and she went into the other state to evade the provisions of our statutes.

INDICTMENT on the Gen. Sts. *c.* 165, § 4, for polygamy. The indictment alleged that Joseph N. Lane, on April 24, 1866, at Salisbury, in the county of Essex, " was lawfully married to one Emma P. Morrill, and the said Morrill then and there had for his lawful wife; and that the said Lane, afterwards, to wit," on May 12, 1873, " at Exeter, in the county of Rockingham, and State of New Hampshire, unlawfully did marry one Nellie A. Upham, and to the said Upham was then and there married, the said Lane being then and there a married man and the lawful husband of the said Morrill, and the said Morrill, his former wife, being then alive, and the said Lane never having been legally divorced from

the bonds of matrimony from the said Morrill; and that the said Lane afterwards did cohabit and continue to cohabit with the said Upham, as his second wife, in this state, to wit, at Salisbury," "for a long space of time, to wit, for the space of two months, next after said twelfth day of said May, the said Morrill, his for= mer wife, being then living, and the said Morrill not having been continually remaining beyond sea, and not having voluntarily withdrawn from the said Lane, and remained absent for the space of seven years together; whereby, and by force of the stat- ute in such case made and provided, the said Lane is deemed to have committed the crime of polygamy."

Trial in the Superior Court, before *Pitman,* J., who reported the case in substance as follows :

It was proved or admitted that the defendant was lawfully married to one Emma P. Morrill, as alleged in the indictment; that thereafter the said Emma was divorced from the defendant by this court, for the cause of adultery on his part; that after said divorce, and while he was a resident of this Commonwealth, he was married to one Nellie A. Upham, at Exeter, in the State of New Hampshire, as alleged in the indictment, and according to the forms of law; and after said last named marriage, the said Emma, the first wife, being still alive, the said defendant lived and cohabited, as alleged in the indictment, with the said Nellie, · as his wife, in this Commonwealth. The laws of the State of New Hampshire relating to the subject matter, it is agreed, may be referred to, if deemed material by either party.

The defendant contended that he was protected by his mar- riage, as above set forth, in the State of New Hampshire, and that the said Nellie must be held and deemed to be his lawful wife ; but the judge ruled otherwise, and, the defendant having been found guilty, reported the case to this court for its decision upon the question of law raised by the defendant.

*H. G. Johnson,* for the defendant.

*C. R. Train,* Attorney General, for the Commonwealth. The case finds : 1. A valid marriage of the defendant to Emma P. Morrill in this Commonwealth ; 2. A divorce *a vinculo* obtained by Emma P. Morrill for the cause of adultery ; 3. A marriage

of the defendant to Nellie A. Upham, "according to the forms of law," in New Hampshire. No valid marriage was proved in New Hampshire, and no consummation of a marriage in New Hampshire was proved.

If it had appeared that the marriage in New Hampshire was a valid one, it is to be observed: 1. This marriage was contracted while the defendant had a former wife living. 2. So far as appears, the defendant and Nellie Upham were at the time both residents of this state. 3. It is plain from the report that the parties went to New Hampshire to evade the provisions of our law. The marriage in New Hampshire was therefore void here. Gen. Sts. *c.* 106, §§ 4, 6. These provisions have been enacted since the decision in *Putnam* v. *Putnam*, 8 Pick. 433. *Commonwealth* v. *Hunt*, 4 Cush. 49. 1 Bish. Mar. & Div. (5th ed.) §§ 369, 371, 372, 374.

If the marriage was valid in New Hampshire, the cohabitation with the second wife in this state was in violation of the Gen. Sts. *c.* 165, § 4. If that section does not apply to this case, what case is there to which it can apply? Suppose he had gone to New Hampshire and married his mother and returned home and cohabited with her, how would such a case differ from this in its legal elements?

GRAY, C. J. The report finds that the defendant was lawfully married to his first wife in this Commonwealth; that she obtained a divorce here from the bond of matrimony, for his adultery; that he was afterwards, while still a resident of this Commonwealth, married to a second wife in the State of New Hampshire, and cohabited with her in this Commonwealth, the first wife being still alive; and the question is whether he is indictable for polygamy, under the Gen. Sts. *c.* 165, § 4.

It is provided by our statutes of divorce that, in cases of divorce from the bond of matrimony, the innocent party may marry again as if the other party were dead; but that any marriage contracted by the guilty party during the life of the other, without having obtained leave from this court to marry again, shall be void, and such party shall be adjudged guilty of polygamy. Gen. Sts. *c.* 107, §§ 25, 26. St. 1864, *c.* 216.

The marriage act, Gen. Sts. *c.* 106, specifies, in §§ 1–3, what marriages shall be void by reason of consanguinity or affinity ; in § 4, that all marriages contracted while either of the parties has a former wife or husband living, except as provided in *c.* 107, shall be void ; in § 5, that no insane person or idiot shall be capable of contracting marriage ; and in § 6 as follows : " When persons resident in this state, in order to evade the preceding provisions, and with an intention of returning to reside in this state, go into another state or country, and there have their marriage solemnized, and afterwards return and reside here, the marriage shall be deemed void in this state."

All these sections, except the last, are manifestly directed and limited to marriages within the jurisdiction of this Commonwealth ; and the last has no application to this case, because it does not appear to have been proved or suggested at the trial that the parties to the second marriage went out of this state to evade our laws, or even that the second wife had resided in this state or knew of the previous marriage and divorce.

By the Gen. Sts. *c.* 165, § 4, " whoever, having a former husband or wife living, marries another person, or continues to cohabit with such second husband or wife in this state," shall (except when the first husband or wife has for seven years been absent and not known to the other party to be living, or in case of a person legally divorced from the bonds of matrimony and not the guilty cause of such divorce) be deemed guilty of polygamy and punished accordingly.

This statute is not intended to make any marriages unlawful which are not declared to be unlawful by other statutes, nor to punish cohabitation under a lawful marriage. Its object is to prohibit unlawful second marriages, whether the parties are actually married in this Commonwealth, or continue after being married elsewhere to cohabit here. But in either alternative, in order to sustain the indictment, the second marriage must be unlawful. It is not enough that the marriage is such as would be unlawful if contracted in this Commonwealth ; it must be a marriage which, being contracted where it was, is unlawful here.

The marriage in New Hampshire is stated in the report to have been " according to the forms of law ; " and it appears by the statutes of New Hampshire, therein referred to, that the only provision relating to the invalidity of marriages on account of the incompetency of parties to contract them is as follows : " All marriages prohibited by law, on account of the consanguinity or affinity of the parties, or where either has a former wife or hus-band living, knowing such wife or husband to be alive, if solem-nized in this state, shall be absolutely void without any decree of divorce or other legal process." Gen. Sts. of N. H. (1867), *c.* 163, § 1. That provision clearly does not extend to a case in which the former wife, having obtained a divorce from the bond of matrimony, was absolutely freed from all obligation to the husband, and in which, as observed by Mr. Justice Wilde, in a like case, " notwithstanding the restraints imposed on the hus-band, he being the guilty cause of the divorce, the dissolution of the marriage contract was total, and not partial." *Commonwealth* v. *Putnam,* 1 Pick. 136, 139. The marriage in New Hampshire must therefore be taken to have been valid by the law of that state.

The question presented by the report is therefore reduced to this : If a man who has been lawfully married in this Common-wealth, and whose wife has obtained a divorce *a vinculo* here because of his adultery, so that he is prohibited by our statutes from marrying again without leave of this court, is married, with-out having obtained leave of the court, and being still a resident of this Commonwealth, to another woman in another state, ac-cording to its laws, and afterwards cohabits with her in this Com-monwealth, is his second marriage valid here ?

The determination of this question depends primarily upon the construction of our statutes, but ultimately upon fundamental principles of jurisprudence, which have been clearly declared by the judgments of our predecessors in this court, and in the light of which those statutes must be read in order to ascertain their just extent and effect.

What marriages between our own citizens shall be recognized as valid in this Commonwealth is a subject within the power of

the Legislature to regulate. But when the statutes are silent, questions of the validity of marriages are to be determined by the *jus gentium*, the common law of nations, the law of nature as generally recognized by all civilized peoples.

By that law, the validity of a marriage depends upon the question whether it was valid where it was contracted; if valid there, it is valid everywhere.

The only exceptions admitted by our law to that general rule are of two classes : 1st. Marriages which are deemed contrary to the law of nature as generally recognized in Christian countries; 2d. Marriages which the Legislature of the Commonwealth has declared shall not be allowed any validity, because contrary to the policy of our own laws.

The first class includes only those void for polygamy or for incest. To bring it within the exception on account of polygamy, one of the parties must have another husband or wife living. To bring it within the exception on the ground of incest, there must be such a relation between the parties contracting as to make the marriage incestuous according to the general opinion of Christendom ; and, by that test, the prohibited degrees include, beside persons in the direct line of consanguinity, brothers and sisters only, and no other collateral kindred. *Wightman* v. *Wightman,* 4 Johns. Ch. 343, 349–351. 2 Kent Com. 83. Story Confl. § 114. *Sutton* v. *Warren,* 10 Met. 451. *Stevenson* v. *Gray,* 17 B. Mon. 193. *Bowers* v. *Bowers,* 10 Rich. Eq. 551.

A marriage abroad between persons more remotely related, not absolutely void by the law of the country where it was celebrated, is valid here, at least until avoided by a suit instituted for the purpose, even if it might have been so avoided in that country ; and this is so, whether the relationship between the parties is one which would not make the marriage void if contracted in this Commonwealth, as in the case of a marriage between a widower and his deceased wife's sister, or one which would invalidate a marriage contracted here, as in the case of a marriage between aunt and nephew.

In *Greenwood* v. *Curtis,* 6 Mass. 358, 378, 379, Chief Justice Parsons said : " If a foreign state allows of marriages incestuous

by the law of nature, as between parent and child, such marriage could not be allowed to have any validity here. But marriages not naturally unlawful, but prohibited by the law of one state, and not of another, if celebrated where they are not prohibited, would be holden valid in a state where they are not allowed. As in this state a marriage between a man and his deceased wife's sister is lawful, but it is not so in some states ; such a marriage celebrated here would be held valid in any other state, and the parties entitled to the benefits of the matrimonial contract." This distinction was approved by Chancellor Kent and by Judge Story. 2 Kent Com. 85, note *a.* Story Confl. § 116.

In *The Queen* v. *Wye,* 7 A. & E. 761, 771 ; *S. C.* 3 N. & P. 6, 13, 14; it was decided that the marriage of a man with his mother's sister in England before the St. of 5 & 6 Will. IV. *c.* 54, though voidable by process in the ecclesiastical courts, was, until so avoided, valid for all civil purposes, including legitimacy and settlement. In accordance with that decision, it was held in *Sutton* v. *Warren,* 10 Met. 451, that such a marriage contracted in England, and never avoided there, must, upon the subsequent removal of the parties to Massachusetts, and the question arising collaterally in an action at common law, be deemed valid here, although, if contracted in this Commonwealth, it would have been absolutely void.

A marriage which is prohibited here by statute, because contrary to the policy of our laws, is yet valid if celebrated elsewhere according to the law of the place, even if the parties are citizens and residents of this Commonwealth, and have gone abroad for the purpose of evading our laws, unless the Legislature has clearly enacted that such marriages out of the state shall have no validity here. This has been repeatedly affirmed by well considered decisions.

For example, while the statutes of Massachusetts prohibited marriages between white persons and negroes or mulattoes, a mulatto and a white woman, inhabitants of Massachusetts, went into Rhode Island, and were there married according to its laws, and immediately returned into Massachusetts ; and it was ruled **by Mr.** Justice Wilde at the trial, and affirmed by the whole

court, that the marriage, even if the parties went into Rhode Island to evade our laws, yet, being good and valid there, must upon general principles be so considered here, and that the wife therefore took the settlement of her husband in this Commonwealth. *Medway* v. *Needham*, 16 Mass. 157.

So it has been held that a man, from whom his wife had obtained in this state a divorce *a vinculo* for his adultery, which by our statutes disabled him from contracting another marriage, might lawfully marry again in another state according to its laws; that the children of such marriage took the settlement of their father in this Commonwealth; and that the new wife was entitled to dower in his lands here, even if the wife as well as the husband was domiciled here, and knew of the previous divorce and its cause, and went into the other state to evade our laws — so long as our statutes did not declare a marriage contracted there with such intent to be void here. *West Cambridge* v. *Lexington*, 1 Pick. 506. *Putnam* v. *Putnam*, 8 Pick. 433. See also *Dickson* v. *Dickson*, 1 Yerger, 110; *Ponsford* v. *Johnson*, 2 Blatchf. C. C. 51; 2 Kent Com. 91–93.

The principles upon which these decisions proceeded were recognized in all the English cases decided before the American Revolution, although it is true, as has since been pointed out, that the particular question in each of them related rather to the forms required than to the capacity of the parties.

Lord Hardwicke's Marriage Act in 1752 provided that all marriages of minors, solemnized by license without the consent of parents or guardians, should be void. St. 26 Geo. II. *c.* 33, § 11. Yet in the first case which arose under that act, in which an English boy of eighteen years old went abroad with an English woman, and was there married to her without such consent, Lord Hardwicke, sitting as chancellor, assumed that if the marriage had been valid by the law of the country in which it was celebrated, it would have been valid in England, saying: " It will not be valid here unless it is so by the laws of the country where it was had; and so it was said by Murray, attorney general, to have been determined lately at the Delegates." And it would seem by the report that the woman defeated an application to the

Ecclesiastical Court to annul the marriage, by refusing to appear there. *Butler* v. *Freeman*, Ambl. 301.

The case, thus referred to as determined at the Delegates, was evidently *Scrimshire* v. *Scrimshire*, decided by Sir Edward Simpson in the Consistory Court in 1752. Of that opinion, Sir George Hay, in *Harford* v. *Morris*, 2 Hagg. Con. 423, 431, said, "Every man has allowed the great and extensive knowledge of the judge ; " and Sir William Wynne, in *Middleton* v. *Janverin*, 2 Hagg. Con. 437, 446, remarked that he remembered to have heard that the judgment was founded on great deliberation, and that Lord Hardwicke was consulted on it.

In *Scrimshire* v. *Scrimshire*, Sir Edward Simpson, in delivering judgment, said : " The question being in substance this, Whether, by the law of this country, marriage contracts are not to be deemed good or bad according to the law of the country in which they are formed ; and whether they are not to be construed by that law ? If such be the law of this country, the rights of English subjects cannot be said to be determined by the laws of France, but by those of their own country, which sanction and adopt this rule of decision." " All nations allow marriage contracts ; they are *juris gentium*, and the subjects of all nations are equally concerned in them ; and from the infinite mischief and confusion that must necessarily arise to the subjects of all nations, with respect to legitimacy, successions and other rights, if the respective laws of different countries were only to be observed, as to marriages contracted by the subjects of those countries abroad, all nations have consented, or must be presumed to consent, for the common benefit and advantage, that such marriages should be good or not, according to the laws of the country where they are made. It is of equal consequence to all, that one rule in these cases should be observed by all countries — that is, the law where the contract is made." And he declared the marriage in that case to be invalid, only because it appeared to be wholly null and void by the laws of France, where it was celebrated. 2 Hagg. Con. 395, 407, 408, 417, 421.

In *Compton* v. *Bearcroft*, (1767-69,) where the parties, both being English subjects and the libellant a minor, ran away and

were married in Scotland, a libel for the nullity of the marriage was dismissed by Sir George Hay in the Court of Arches, upon the ground that Lord Hardwicke's Act did not extend to Scotland, but by the Court of Delegates on appeal, consisting of Justices Gould and Aston, Baron Perrott, and two doctors of civil law, upon the broader ground that the marriage was good by the *lex loci*. 2 Hagg. Con. 430, 443, 444 & note; *S. C.* Bul. N. P. 113, 114. See also *Ilderton* v. *Ilderton*, 2 H. Bl. 145; *Dalrymple* v. *Dalrymple*, 2 Hagg. Con. 54, 59; *Ruding* v. *Smith*, Ib. 371, 390, 391; *Steele* v. *Braddell*, Milward, 1, 21.

In a recent case in the House of Lords, the cases of *Medway* v. *Needham*, 16 Mass. 157, and *Sutton* v. *Warren*, 10 Met. 451, above cited, have been severely criticised, and pointedly denied to be law. *Brook* v. *Brook*, 9 H. L. Cas. 193; *S. C.* 3 Sm. & Giff. 481. As that court is the one of all foreign tribunals, the opinions of which, owing to the learning, experience and ability of the judges, we are accustomed to regard with the most respect, it becomes necessary to examine with care the scope of that decision, and the soundness of the reasons assigned for it; and in order to make this examination intelligible, it will be convenient first to refer to the English statutes and to some earlier decisions.

Several statutes of Henry VIII., which it is unnecessary to state in detail, declared marriages within certain degrees of consanguinity and affinity, and among others the marriage of a widower with his deceased wife's sister, to be " contrary to God's law as limited and declared by act of Parliament." Sts. 25 Hen. VIII. *c.* 22; 28 Hen. VIII. *cc.* 7, 16; 32 Hen. VIII. *c.* 38. While those statutes remained unaltered, a period of nearly three hundred years, such marriages were held by the judges not to be absolutely void, but voidable only by suit in the ecclesiastical courts during the lifetime of both parties, and, if not so avoided, were treated as valid, the wife entitled to dower, and the children of the marriage legitimate. Co. Lit. 33. *Hinks* v. *Harris*, 4 Mod. 182; *S. C.* 12 Mod. 35; Carth. 271; 2 Salk. 548. Lord Hardwicke, in *Brownsword* v. *Edwards*, 2 Ves. Sen. 243, 245. 1 Bl. Com. 434, 435. *Elliott* v. *Gurr*, 2 Phillim. 16. *The Queen* v. *Wye*, 7 A. & E. 761, 771; *S. C.* 3 N. & P. 6, 13, 14. *Westby* v.

*Westby,* 2 Dru. & War. 502, 515, 516 ; *S. C.* 1 Con. & Laws. 537, 544, 545 ; 4 Irish Eq. 585, 593.

The St. of 5 & 6 Will. IV. *c.* 54, commonly known as Lord Lyndhurst's Act, provided, as to marriages between persons within the prohibited degrees of affinity, as follows : 1st, that such marriages, celebrated before the passage of the act, should not be annulled, except in a suit already pending in the ecclesiastical courts ; 2d, that such marriages, thereafter celebrated, should be absolutely null and void to all intents and purposes whatever; 3d, that nothing in this act should be construed to extend to Scotland.

The marriage of a widower with the sister of his deceased wife, in England, after this statute, was held to be within the prohibited degrees and utterly void. *The Queen* v. *Chadwick*, 11 Q. B. 173, 234.

A case afterwards came before the Scotch courts, in which an English citizen married his deceased wife's sister in England ; the validity of the marriage was not disputed during her life, and she died before the St. of Will. IV.; and the question was, whether the children of the marriage could inherit his lands in Scotland. The Scotch courts, in a series of very able opinions, held that they could, upon the ground that by the law of England, the marriage, not having been challenged in the lifetime of both parties, could not in any form be declared invalid in England, and the children were legitimate there, and must therefore be deemed legitimate in Scotland. *Fenton* v. *Livingstone*, 16 Ct. of Sess. Cas. (2d Series) 104, and 18 Ib. 865. The House of Lords, on appeal, reversed that decision, and held that, although the marriage had, by reason of the peculiar rules governing the English courts of temporal and ecclesiastical jurisdiction, become irrevocable there, yet it was always illegal ; and that, those rules not being applicable in the Scotch courts, the legitimacy of the children in Scotland depended upon the question whether the marriage was illegal by the law of Scotland. *S. C.* 3 Macq. 497. The Scotch court thereupon decided that the marriage was illegal, and that the children were incapable of inheriting lands in Scotland. *S. C.* 23 Ct. of Sess. Cas. (2d Series) 366.

In *Brook* v. *Brook, ubi supra,* a widower and the sister of his deceased wife, being lawfully domiciled in England, while on a temporary visit to Denmark, had a marriage solemnized between them, which was by the laws of Denmark lawful and valid to all intents and purposes whatsoever.  In a suit in equity, brought after the death of both parties, to ascertain the rights of the children in their father's property, the House of Lords, in accordance with the opinions of Lords Campbell, Cranworth, St. Leonards and Wensleydale, and affirming a decree rendered by Vice Chancellor Stuart, assisted by Mr. Justice Cresswell, held that the marriage in Denmark was wholly void by the St. of Will. IV., and that the children of that marriage were bastards.

The decision was put, by the learned judges who concurred in it, upon three different grounds.

The first ground was that the St. of Will. IV. disqualified English subjects everywhere from contracting such a marriage. This ground was taken in the court below, and by Lord St. Leonards in the House of Lords.   3 Sm. & Giff. 522, 525.   9 H. L. Cas. 234–238.   But it was expressly disclaimed by Lord Campbell, Lord Cranworth and Lord Wensleydale, the two former of whom expressed opinions that the statute did not extend to all the colonies, and all three declared that they did not think its purpose was to put an end to such marriages by British subjects throughout the world.   9 H. L. Cas. 214, 222, 240.

The second ground, which was suggested by Mr. Justice Cresswell and Lord Wensleydale only, and is opposed to all the American authorities, was that the case justly fell within the first exception, stated in Story Confl. § 114, of marriages involving polygamy and incest.   3 Sm. & Giff. 513.   9 H. L. Cas. 241, 245.   In view of that position, it may be observed that in an earlier case, in which Lord Wensleydale himself (then Baron Parke) delivered the opinion, a marriage of a widower with his deceased wife's sister, before the St. of Will. IV., was prevented from being made irrevocable by that statute, only by the institution, a week before its passage, of a suit for nullity in the Ecclesiastical Court by the father of the supposed wife; and by the decision of the Privy Council, that because, if the marriage was not set

aside, the birth of a child of the marriage would impose a legal obligation upon the grandfather to maintain the child in the event of its being poor, lame or impotent, and unable to work, he had, according to the rules of the ecclesiastical courts, a sufficient interest, " although of an extremely minute and contingent character," to support such a suit. *Sherwood* v. *Ray*, 1 Moore P. C. 353, 401, 402.

The third ground, upon which alone all the law lords agreed, was that the St. of Will. IV. made all future marriages of this kind between English subjects, having their domicil in England, absolutely void, because declared by act of Parliament to be contrary to the law of God, and must therefore be deemed to include such marriages, although solemnized out of the British dominions.

The law of England, as thus declared by its highest legislative and judicial authorities, is certainly presented in a remarkable aspect. 1st. Before the St. of Will. IV., marriages within the prohibited degrees of affinity, if not avoided by a direct suit for the purpose during the lifetime of both parties, had the same effect in England, in every respect, as if wholly valid. 2d. This statute itself made such marriages, already solemnized in England, irrevocably valid there, if no suit to annul them was already pending. 3d. It left such marriages in England, even before the statute, to be declared illegal in the Scotch courts, at least so far as rights in real estate in Scotland were concerned. 4th. According to the opinion of the majority of the law lords, it did not invalidate marriages of English subjects in English colonies, in which a different law of marriage prevailed. 5th. But it did make future marriages of this kind, contracted either in England or in a foreign country, by English subjects domiciled in England, absolutely void, because declared by the British Parliament to be contrary to the law of God.

The judgment proceeds upon the ground that an act of Parliament is not merely an ordinance of man, but a conclusive declaration of the law of God; and the result is that the law of God, as declared by act of Parliament and expounded by the House of Lords, varies according to time, place, length of life of parties

pecuniary interests of third persons, petitions to human tribunals, and technical rules of statutory construction and judicial procedure.

The case recalls the saying of Lord Holt, in *London* v. *Wood*, 12 Mod. 669, 687, 688, that "an act of Parliament can do no wrong, though it may do several things that look pretty odd;" and illustrates the effect of narrow views of policy, of the doctrine of "the omnipotence of Parliament," and of the consequent unfamiliarity with questions of general jurisprudence, upon judges of the greatest vigor of mind, and of the profoundest learning in the municipal law and in the forms and usages of the judicial system of their own country.

Such a decision, upon such reasons, from any tribunal, however eminent, can have no weight in inducing a court, not bound by it as authority, to overrule or disregard its own decisions.

The provision of the Gen. Sts. *c.* 107, § 25, forbidding the guilty party to a divorce to contract another marriage, during the life of the other party, without leave of this court, on pain of being adjudged guilty of polygamy, does not create a permanent incapacity, like one arising from consanguinity or affinity. It is rather in the nature of the imposition of a penalty, to which it would be difficult to give any extra-territorial operation. *West Cambridge* v. *Lexington,* 1 Pick. 506, 510, 512. *Clark* v. *Clark,* 8 Cush. 385, 386. Upon the principles and authorities stated in the earlier part of this opinion, it certainly cannot invalidate a subsequent marriage in another state according to its laws, at least without proof that the parties went into that state and were married there with the intent to evade the provisions of the statutes of this Commonwealth. No such intent being shown in this case, we need not consider its effect, if proved, nor whether the indictment is in due form. See *Commonwealth* v. *Putnam,* 1 Pick. 136, 139; *Commonwealth* v. *Hunt,* 4 Cush. 49.

*New trial ordered.*