## Ex parte SUZANNA.

(District Court, D. Massachusetts. January 28, 1924.)

### No. 2517.

1. Aliens ⬤⟹54—Order of deportation reviewable on question of law.
    An order of deportation is reviewable by the courts on habeas corpus, if its validity depends on a question of law.

2. Aliens ⬤⟹46—Marriage by proxy held to give alien woman status of "wife."
    A marriage by proxy between a woman resident in Portugal, where such marriages are valid, and a man resident in Pennsylvania, where common-law marriages are valid, held to give the woman the status of "wife," within the meaning of Act Feb. 5, 1917. § 3. as amended by Act June 5. 1920 (Comp. St. Ann. Supp. 1923, § 4289¼b), providing that an illiterate woman over 16 years of age shall not be admitted unless she is the "wife, mother," etc., of an admissible or domiciled alien or a citizen.

    [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Wife.]

3. Marriage ⬤⟹1—"Marriage" defined.
    The word "marriage" is used in one sense to designate the ceremony by which two persons are united in wedlock, and in another sense designates the state of wedlock.

    [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Marriage.]

Habeas corpus. On petition of Sabina Suzanna for writ of habeas corpus. Writ granted.

Cornelius F. Keating, of Boston, Mass., and John M. Lyons, of New York City, for plaintiff.

John W. Schenck, Asst. U. S. Atty., of Boston, Mass., for defendant.

LOWELL, District Judge. Petition for writ of habeas corpus to prevent the deportation of a Portuguese woman, who was prevented from entering the United States by the immigration authorities at Providence, who ordered her to be sent back to Portugal. There was an appeal to the Secretary of Labor, who affirmed the order.

[1] It is elementary law that the decision of the immigration officials

⬤⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes.

on questions of fact is conclusive on this court (U. S. v. Ju Toy, 198 U. S. 253, 25 Sup. Ct. 644, 49 L. Ed. 1040; Ng Fung Ho v. White, 259 U. S. 276, 42 Sup. Ct. 492, 66 L. Ed. 938; U. S. v. Brooks [D. C.] 284 Fed. 908), but that their orders are subject to revision if they depend for their validity on a question of law (Gegiow v. Uhl, 239 U. S. 3, 36 Sup. Ct. 2, 60 L. Ed. 114; Ex parte Mitchell [D. C.] 256 Fed. 229).

[2] The present petition involves the legal meaning of the word "wife," as used in section 3 of the Act of Congress of February 5, 1917, as amended by the Act of June 5, 1920, c. 243 (U. S. Comp. St. Ann. Supp. 1923, § 4289¼b), which provides, among other things, that an illiterate alien woman over 16 years of age shall not be allowed to land, unless she is the wife, mother, grandmother, or daughter of an alien lawfully seeking admission to the United States, or already established here.

Sabina Suzanna could neither read nor write. She contended that she was entitled to admission as the wife of Manual Gomes, a resident of Philadelphia. She was excluded solely on the ground that she was not Gomes' wife, as there was no contention that the number of Portuguese citizens already admitted had exceeded the number allowed by the so-called "quota" law. There was no evidence that the marriage was fraudulently contracted in order to evade the immigration law.

The facts in this case, which raise a novel and interesting question of law, are as follows: Manuel Gomes was domiciled in Philadelphia. He contracted a marrage with Sabina Suzanna by proxy. The law of Portugal allows such proxy marriages (Ringrose Marriage and Divorce Laws, p. 117 et seq.), and the required forms were properly carried out. The woman came to this country, and was prevented from landing by the immigration authorities, on the ground that she was illiterate. They refused to allow her to land as being Gomes' wife, taking the position that the proxy marriage was invalid under the laws of the United States.

The validity of a proxy marriage has never been determined, so far as I am aware, in any case in England or the United States. It arose in two cases, In re Lum Lin Ying (D. C.) 59 Fed. 682, and in Republic of Hawaii v. Li Shee, 12 Hawaii, 329, but in neither of them was it decided. Gomes was unconsciously following an illustrious precedent set by a man who was also a native of the Iberian peninsula. In 1516 Vasco Nunez de Balboa, the discoverer of the Pacific Ocean (see Prescott, Conquest of Peru, vol. I, p. 194)—Keats, in his famous sonnet "On First Looking Into Chapman's Homer," wrongly ascribes the discovery to Cortes—was wedded by proxy while in Darien to the daughter, who was in Spain, of the Royal Governor Pedrarias. Quintana, Vidas de Espanoles Celebres, Madrid, 1914, p. 289.

Washington Irving's description of this occurrence (Life of Columbus, vol. III, p. 228) omits all specific reference to the marriage by proxy, but his account is not inconsistent with that of the Spanish author.

[3] Some confusion in the authorities has arisen from the use of the word "marriage" in two different senses. In one sense it designates

the ceremony by which two persons are united in wedlock. In the other sense it designates the state of wedlock itself. Story, Conflict of Laws (8th Ed.) p. 215, note; Eversley, Domestic Relations, p. 2; Encyclopædia Britannica (11th Ed.) vol. 17, p. 753, article on "Marriage." This distinction has been pointed out by Lord Justice Cotton in Harvey v. Farnie, 6 P. D. 35, 48, and by Judge Wallace in Campbell v. Crampton (C. C.) 2 Fed. R. 417. The distinction is clearly brought out by two quotations from Shakespeare. Hamlet says:

> "Thrift, thrift, Horatio! the funeral-baked meats
> Did coldly furnish forth the marriage tables."
> —(Hamlet, act I, scene 2)

an instance of the first meaning. In one of the sonnets this verse occurs:

> "Let me not to the marriage of true minds
> Admit impediments; love is not love
> Which alters when it alteration finds,"
> —(Sonnet 116)

an instance of the second meaning. Byron uses the word in the first sense in a familiar quotation:

> "Soft eyes looked love to eyes which spake again,
> And all went merry as a marriage bell."
> —(Childe Harold, canto 3, stanza 21).

The law of marriage as a status depends upon that of the domicile of the parties, according to the decisions of many English and American courts. See a very able opinion by Rugg, C. J., in Kapigian v. Minassian, 212 Mass. 412, 99 N. E. 264, Ann. Cas. 1913D, 535. But it is the general law that, as to the marriage ceremony, the law of the state where the celebration of it took place is the law which governs. 3 Beale, Cases on the Conflict of Laws, p. 523; 1 Wharton, Conflict of Laws (3d Ed.) 367, 368; Westlake, Private International Law (6th Ed.) 57; Story, Conflict of Laws (8th Ed.) p. 215; Dicey, Conflict of Laws (3d Ed.) 661; Minor, Conflict of Laws, 167; Spencer, Domestic Relations, § 95; Marriage by Proxy and the Conflict of Laws, 32 Harvard Law Review, 473, 483; Medway v. Needham, 16 Mass. 157, 8 Am. Dec. 131; Sutton v. Warren, 10 Metc. (Mass.) 451; Loring v. Thorndike, 5 Allen (Mass.) 257; Com. v. Lane, 113 Mass. 458, 18 Am. Rep. 509. Sottomayor v. De Barros, 3 P. D. 1, 5; Ogden v. Ogden, [1907] P. 107; [1908] P. 46; In re Bozzelli's Settlement, [1902] 1 Ch. 751, and cases; Van Voorhis v. Brintnall, 86 N. Y. 18, 40 Am. Rep. 505; Phillips v. Gregg, 10 Watts (Pa.) 158, 36 Am. Dec. 158; State v. Hand, 87 Neb. 189, 126 N. W. 1002, 28 L. R. A. (N. S.) 753; Sturgis v. Sturgis, 51 Or. 10, 93 Pac. 696, 15 L. R. A. (N. S.) 1034, 131 Am. St. Rep. 724.

A marriage, though the most sacred of all contracts, is yet a contract. Great Northern Ry. v. Johnson, 254 Fed. 683, 166 C. C. A. 181; Catholic Encyclopædia, vol. 9, p. 702; Cunningham v. Cunningham, 206 N. Y. 341, 352, 99 N. E. 845, 43 L. R. A. (N. S.) 355, per Werner, J., dissenting. It is true that when the contract is made there results from it a status which it is of the greatest importance for the state to preserve. The church since very early times has prescribed

due ceremonials for the celebration of marriage, to the end that its sanctity may be impressed on the parties. It is of such importance to the state that all nations have passed laws relating to it, and have forbidden bigamous marriages and those between persons who are too nearly related to each other. These are salutary laws, and a marriage contracted in opposition to them is invalid. Com. v. Lane, 113 Mass. 458, 18 Am. Rep. 509.

Most laws require that both parties shall appear before a magistrate or a priest and give their consent. But this requirement of an official sanction is not always absolutely essential, as it has been held in many states that a marriage, though consummated without any ceremonial whatever, is valid. 18 R. C. L. 391; Koegel, Common-Law Marriage; Patterson v. Gaines, 6 How. 550, 12 L. Ed. 553; Meister v. Moore, 96 U. S. 76, 24 L. Ed. 826; Phillips v. Gregg, 10 Watts (Pa.) 158, 36 Am. Dec. 158; Richard v. Brehm, 73 Pa. 140, 13 Am. Rep. 733. These authorities are instances of the so-called "common-law" marriages, and hold that the only legal requisite is that the parties to the marriage shall consent.

· But is there any reason of public policy why the contract itself should require any different formalities than any other contract? Does the mere' presence of the parties at the time of the making of the contract add any essential element to the agreement between them? Royal marriages celebrated by proxy have long been considered true marriages. Queen Mary of England married Philip the Second of Spain before Bishop Gardiner, the Spanish monarch being represented at the ceremony by Count Egmont (Froude, History of England, vol. 6, p. 189), and there are records of other such marriages (Tiffany, Domestic Relations [3d Ed.] p. 54). We have already noticed the marriage by proxy of Balboa, and the custom is said to have been common during the Middle Ages in Europe. 32 Harv. L. Rev. 477. If royalty could do it, why may not those of more common clay be allowed to follow their example? There is a very instructive decision in the Eighth Circuit to the effect that marriage, like any other contract, may be effected by correspondence. Great Northern Railway Co. v. Johnson, 254 Fed. 683, 166 C. C. A. 181. See, also, Catholic Encyclopædia, vol. 9, p. 702.

It is an interesting fact, also, that toward the end of the war with Germany the Judge Advocate General gave his opinion that a marriage by letter was probably valid. 32 Harv. L. Rev. 488. Schouler erroneously states that it was the Adjutant General who gave this opinion. See 2 Schouler, Marriage, Divorce, Separation and Domestic Relations (6th Ed.) § 1212.

The question, as has been said, has never been judicially determined. There are dicta and opinions of text-writers to the contrary. Comm. v. Farmers', etc., Co., 107 Ky. 1, 3, 52 S. W. 799; Tiffany, Domestic Relations (3d Ed.) p. 54; 1 Mechem, Agency (2d Ed.) § 126; 18 R. C. L. 392; 1 Am. and Eng. Ency. Law, (2d Ed.) p. 971. In the case of In re Lum Lin Ying, ubi supra, where the question came nearest to being decided, the learned judge evidently thought that the marriage was bad, but it appears by a careful study of his opinion that he confused the two meanings of the word "marriage." He speaks of the

marriage not having been solemnized in China, while the statement of facts shows that it was contracted there. In an article in the Harvard Law Review for the year 1919 (32 Harv. L. Rev. 473) Professor ·Lorenzen recites the history of proxy marriages, and comes to the conclusion that such a marriage is valid in any state of the Union where common-law marriages are recognized.

The question must be decided in this case on the law of Pennsylvania, as Gomes was domiciled there. Great Northern Railway Co. v. Johnson, 254 Fed. 683, 685, 166 C. C. A. 181. It is well settled in Pennsylvania that a common-law marriage is valid. Patterson v. Gaines, 6 How. 550, 12 L. Ed. 553; Phillips v. Gregg, 10 Watts (Pa.) 158, 36 Am. Dec. 158; Richard v. Brehm, 73 Pa. 140, 13 Am. Rep. 733. We have seen that the overwhelming weight of authority—in fact, the unanimous opinion of all judges and text-writers—is that a marriage contract, if valid where made, is valid everywhere, provided that it is not celebrated between two persons who are too nearly related to each other, or between two persons one of whom had a wife or husband still living. See cases cited above, p. 715.

There is nothing in the law of Pennsylvania which I have been able to discover requiring the personal presence of the parties at the ceremony, and I agree with the learned opinion of Professor Lorenzen that the proxy marriage celebrated in Portugal is valid in Pennsylvania. The result is that Sabina Suzanna was the wife of Manuel Gomes, and that she had the legal right to enter the United States.

Let the writ issue.