SETH M. MILLIKEN & others *vs.* SARAH A. PRATT.

Worcester.    Oct. 4, 1877. — Sept. 12, 1878.    ENDICOTT & LORD, JJ,
absent.

The validity of a contract, even as regards the capacity of the parties, is generally
to be determined by the law of the state in which it is made.

If an inhabitant of this Commonwealth buys goods personally in another state, or
orders them by letter mailed here, and they are delivered to a carrier for him
there, the contract is made in that state.

A contract of guaranty, signed in this Commonwealth and sent by mail to another
state, and assented to and acted on there, for the price of goods sold there, is
made in that state.

A contract, made in another state by a married woman domiciled here, which a
married woman was not at the time capable of making under the law of this
Commonwealth, but was then allowed by the law of that state to make, and which
she could now lawfully make in this Commonwealth, will sustain an action against
her in our courts, although the contract was made by letter sent from her here to
the other party there.

CONTRACT to recover $500 and interest from January 6, 1872.
Writ dated June 30, 1875.    The case was submitted to the Su-
perior Court on agreed facts, in substance as follows :

The plaintiffs are partners doing business in Portland, Maine,
under the firm name of Deering, Milliken & Co.    The defendant
is and has been since 1850, the wife of Daniel Pratt, and both
have always resided in Massachusetts.    In 1870, Daniel, who was
then doing business in Massachusetts, applied to the plaintiffs
at Portland for credit, and they required of him, as a condition
of granting the same, a guaranty from the defendant to the
amount of five hundred dollars, and accordingly he procured from
his wife the following instrument :

" Portland, January 29, 1870.    In consideration of one dollar
paid by Deering, Milliken & Co., receipt of which is hereby ac-
knowledged, I guarantee the payment to them by Daniel Pratt
of the sum of five hundred dollars, from time to time as he may
want — this to be a continuing guaranty.    Sarah A. Pratt."

This instrument was executed by the defendant two or three
days after its date, at her home in Massachusetts, and there de-
livered by her to her husband, who sent it by mail from Massa-
chusetts to the plaintiffs in Portland ; and the plaintiffs received
it from the post office in Portland early in February, 1870.

The plaintiffs subsequently sold and delivered goods to Daniel from time to time until October 7, 1871, and charged the same to him, and, if competent, it may be taken to be true, that in so doing they relied upon the guaranty.   Between February, 1870, and September 1, 1871, they sold and delivered goods to him on credit to an amount largely exceeding $500, which were fully settled and paid for by him.   This action is brought for goods sold from September 1, 1871, to October 7, 1871, inclusive, amounting to $860.12, upon which he paid $300, leaving a balance due of $560.12.   The one dollar mentioned in the guaranty was not paid, and the only consideration moving to the defendant therefor was the giving of credit by the plaintiffs to her husband.   Some of the goods were selected personally by Daniel at the plaintiffs' store in Portland, others were ordered by letters mailed by Daniel from Massachusetts to the plaintiffs at Portland, and all were sent by the plaintiffs by express from Portland to Daniel in Massachusetts, who paid all express charges.   The parties were cognizant of the facts.

By a statute of Maine, duly enacted and approved in 1866, it is enacted that " the contracts of any married woman, made for any lawful purpose, shall be valid and binding, and may be enforced in the same manner as if she were sole." The statutes and the decisions of the court of Maine may be referred to.

Payment was duly demanded of the defendant before the date of the writ, and was refused by her.

The Superior Court ordered judgment for the defendant ; and the plaintiffs appealed to this court.

*W. W. Rice,* for the plaintiffs.

*W. S. Stearns & J. H. Butler,* for the defendant.

GRAY, C. J.   The general rule is that the validity of a contract is to be determined by the law of the state in which it is made ; if it is valid there, it is deemed valid everywhere, and will sustain an action in the courts of a state whose laws do not permit such a contract.   *Scudder* v. *Union National Bank,* 91 U. S. 406.   Even a contract expressly prohibited by the statutes of the state in which the suit is brought, if not in itself immoral, is not necessarily nor usually deemed so invalid that the comity of the state, as administered by its courts, will refuse to entertain an action on such a contract made by one of its own

citizens abroad in a state the laws of which permit it. *Green-wood* v. *Curtis*, 6 Mass. 358. *M'Intyre* v. *Parks*, 3 Met. 207.

If the contract is completed in another state, it makes no difference in principle whether the citizen of this state goes in person, or sends an agent, or writes a letter, across the boundary line between the two states. As was said by Lord Lyndhurst, " If I, residing in England, send down my agent to Scotland, and he makes contracts for me there, it is the same as if I myself went there and made them." *Pattison* v. *Mills*, 1 Dow & Cl. 342, 363. So if a person residing in this state signs and transmits, either by a messenger or through the post-office, to a person in another state, a written contract, which requires no special forms or solemnities in its execution, and no signature of the person to whom it is addressed, and is assented to and acted on by him there, the contract is made there, just as if the writer personally took the executed contract into the other state, or wrote and signed it there ; and it is no objection to the maintenance of an action thereon here, that such a contract is prohibited by the law of this Commonwealth. *M'Intyre* v. *Parks*, above cited.

The guaranty, bearing date of Portland, in the State of Maine, was executed by the defendant, a married woman, having her home in this Commonwealth, as collateral security for the liability of her husband for goods sold by the plaintiffs to him, and was sent by her through him by mail to the plaintiffs at Portland. The sales of the goods ordered by him from the plaintiffs at Portland, and there delivered by them to him in person, or to a carrier for him, were made in the State of Maine. *Orcutt* v. *Nelson*, 1 Gray, 536. *Kline* v. *Baker*, 99 Mass. 253. The contract between the defendant and the plaintiffs was complete when the guaranty had been received and acted on by them at Portland, and not before. *Jordan* v. *Dobbins*, 122 Mass. 168. It must therefore be treated as made and to be performed in the State of Maine.

The law of Maine authorized a married woman to bind herself by any contract as if she were unmarried. St. of Maine of 1866, c. 52. *Mayo* v. *Hutchinson*, 57 Maine, 546. The law of Massachusetts, as then existing, did not allow her to enter into a con tract as surety or for the accommodation of her husband or o'

any third person. Gen. Sts. *c.* 108, § 3. *Nourse* v. *Henshaw*, 123 Mass. 96. Since the making of the contract sued on, and before the bringing of this action, the law of this Commonwealth has been changed, so as to enable married women to make such contracts. St. 1874, *c.* 184. *Major* v. *Holmes*, 124 Mass. 108. *Kenworthy* v. *Sawyer*, *ante*, 28.

The question therefore is, whether a contract made in another state by a married woman domiciled here, which a married woman was not at the time capable of making under the law of this Commonwealth, but was then allowed by the law of that state to make, and which she could now lawfully make in this Commonwealth, will sustain an action against her in our courts.

It has been often stated by commentators that the law of the domicil, regulating the capacity of a person, accompanies and governs the person everywhere. But this statement, in modern times at least, is subject to many qualifications; and the opinions of foreign jurists upon the subject, the principal of which are collected in the treatises of Mr. Justice Story and of Dr. Francis Wharton on the Conflict of Laws, are too varying and contradictory to control the general current of the English and American authorities in favor of holding that a contract, which by the law of the place is recognized as lawfully made by a capable person, is valid everywhere, although the person would not, under the law of his domicil, be deemed capable of making it.

Two cases in the time of Lord Hardwicke have been sometimes supposed to sustain the opposite view. The first is *Ex parte Lewis*, 1 Ves. Sen. 298, decided in the Court of Chancery in 1749, in which a petition, under the St. of 4 Geo. II. *c.* 10, that a lunatic heir of a mortgagee might be directed to convey to the mortgagor, was granted by Lord Hardwicke, on the ground of " there having been a proceeding before a proper jurisdiction, the Senate of Hamburgh, where he resided, upon which he was found *non compos*, and a curator or guardian appointed for him and his affairs, which proceeding the court was obliged to take notice of." But the foreign adjudication was thus taken notice of as competent evidence of the lunacy only; and that the authority of the foreign guardian was not recognized as extending to England is evident from the fact that the conveyance prayed for and ordered was from the 'unatic himself. The other is

*Morrison's case*, in the House of Lords in 1750, for a long time principally known in England and America by the imperfect and conflicting statements of counsel *arguendo* in *Sill* v. *Worswick*, 1 H. Bl. 677, 682; but in which, as the Scotch books of reports show, the decision really was that a committee, appointed in England, of a lunatic residing there, could not sue in Scotland upon a debt due him, but that, upon obtaining a power of attorney from the lunatic, they might maintain a suit in Scotland in his name; and Lord Hardwicke said that the law would be the same in England — evidently meaning, as appears by his own statement afterwards, that the same rule would prevail in England in the case of a foreigner who had been declared a lunatic, and as such put under guardianship in the country of his domicil. Morison's Dict. Dec. 4595. 1 Cr. & Stew. 454, 459. *Thorne* v. *Watkins*, 2 Ves. Sen. 35, 37. Both those cases, therefore, rightly understood, are in exact accordance with the later decisions, by which it is now settled in Great Britain and in the United States, that the appointment of a guardian of an infant or lunatic in one state or country gives him no authority and has no effect in another, except so far as it may influence the discretion of the courts of the latter, in the exercise of their own independent jurisdiction, to appoint the same person guardian, or to decree the custody of the ward to him. *Ex parte Watkins*, 2 Ves. Sen. 470. *In re Houstoun*, 1 Russ. 312. *Johnstone* v. *Beattie*, 10 Cl. & Fin. 42. *Stuart* v. *Bute*, 9 H. L. Cas. 440; *S. C.* 4 Macq. 1. *Nugent* v. *Vetzera*, L. R. 2 Eq. 704. *Woodworth* v. *Spring*, 4 Allen, 321. Story Confl. § 499.

Lord Eldon, when Chief Justice of the Common Pleas, and Chief Justice Kent and his associates in the Supreme Court of New York, held that the question whether an infant was liable to an action in the courts of his domicil, upon a contract made by him in a foreign country, depended upon the question whether by the law of that country such a contract bound an infant. *Male* v. *Roberts*, 3 Esp. 163. *Thompson* v. *Ketcham*, 8 Johns. 189.

Mr. Westlake, who wrote in 1858, after citing the decision of Lord Eldon, well observed, "That there is not more authority on the subject may be referred to its not having been questioned;' and summed up the law of England thus: " While the English law remains as it is, it must, on principle, be taken as exclud‐

ing, in the case of transactions having their seat here, not only a foreign age of majority, but also all foreign determination of status or capacity, whether made by law or by judicial act, since no difference can be established between the cases, nor does any exist on the continent." " The validity of a contract made out of England, with regard to the personal capacity of the contractor, will be referred in our courts to the *lex loci contractûs ;* that is, not to its particular provisions on the capacity of its domiciled subjects, but in this sense, that, if good where made, the contract will be held good here, and conversely." Westlake's Private International Law, §§ 401, 402, 404.

In a recent case, Lord Romilly, M. R., held that a legacy bequeathed by one domiciled in England to a boy domiciled with his father in Hamburgh, by the law of which boys do not become of age until twenty-two and the father is entitled as guardian to receive a legacy bequeathed to an infant, might be paid to the boy at his coming of age by the law of England, although still a minor by the law of his domicil, and in the meanwhile must be dealt with as an infant's legacy. *In re Hellmann's Will,* L. R. 2 Eq. 363.

The Supreme Court of Louisiana, in two cases which have long been considered leading authorities, strongly asserted the doctrine that a person was bound by a contract which he was capable by the law of the place, though not by the law of his own domicil, of making ; as, for instance, in the case of a contract made by a person over twenty-one and under twenty-five years of age, in a state whose laws authorized contracts to be made at twenty-one, whereas by the laws of his domicil he was incapable of contracting under twenty-five. *Baldwin* v. *Gray,* 16 Martin, 192, 193. *Saul* v. *His Creditors,* 17 Martin, 569, 597. The same doctrine was recognized as well settled in *Andrews* v. *His Creditors,* 11 Louisiana, 464, 476.

In other cases of less note in that state, the question of personal capacity was indeed spoken of as governed by the law of the domicil. *Le Breton* v. *Nouchet,* 3 Martin, 60, 70. *Barrera* v. *Alpuente,* 18 Martin, 69, 70. *Garnier* v. *Poydras,* 13 Louisiana, 177, 182. But in none of them was the statement necessary to the decision. In *Le Breton* v. *Nouchet,* the point adjudged was, that where a man and woman domiciled in Louisiana

(by the law of which the wife retains her separate property) were married, with the intention of returning to Louisiana, in the Mississippi Territory, (where the rule of the common law prevailed, by which the wife's personal property became her husband's,) the law of Louisiana, in which the parties intended to continue to reside, governed their rights in the wife's property; and the further expression of an opinion that the rule would be the same if the parties intended to remain in the Mississippi Territory was purely *obiter dictum*, and can hardly be reconciled with later decisions of the same court. *Gale* v. *Davis*, 4 Martin, 645. *Saul* v. *His Creditors*, 17 Martin, 569. See also *Read* v. *Earle*, 12 Gray, 423. In *Barrera* v. *Alpuente*, the case was discussed in the opinion upon the hypothesis that the capacity to receive a legacy was governed by the law of the domicil; but the same result would have followed from holding that it was governed by the law of the place where the right accrued and was sought to be enforced. In *Garnier* v. *Poydras*, the decision turned on the validity of a power of attorney executed and a judicial authorization given in France, where the husband and wife had always resided.

In *Greenwood* v. *Curtis*, Chief Justice Parsons said, " By the common law, upon principles of national comity, a contract made in a foreign place, and to be there executed, if valid by the laws of that place, may be a legitimate ground of action in the courts of this state; although such contract may not be valid by our laws, or even may be prohibited to our citizens; " and that the Chief Justice considered this rule as extending to questions of capacity is evident from his subsequent illustration of a marriage contracted abroad between persons prohibited to intermarry by the law of their domicil. 6 Mass. 377–379. The validity of such marriages (except in case of polygamy, or of marriages incestuous according to the general opinion of Christendom) has been repeatedly affirmed in this Commonwealth. *Medway* v. *Needham*, 16 Mass. 157. *Sutton* v. *Warren*, 10 Met. 451. *Commonwealth* v. *Lane*, 113 Mass. 458.

The recent decision in *Sottomayor* v. *De Barros*, 3 P. D. 1, by which Lords Justices James, Baggallay and Cotton, without referring to any of the cases that we have cited, and reversing the judgment of Sir Robert Phillimore in 2 P. D. 81, held that a

marriage in England between first cousins, Portuguese subjects, resident in England, who by the law of Portugal were incapable of intermarrying except by a Papal dispensation, was therefore null and void in England, is utterly opposed to our law ; and consequently the *dictum* of Lord Justice Cotton, " It is a well-recognized principle of law that the question of personal capacity to enter into any contract is to be decided by the law of domicil," is entitled to little weight here.

It is true that there are reasons of public policy for upholding the validity of marriages, that are not applicable to ordinary contracts ; but a greater disregard of the *lex domicilii* can hardly be suggested, than in the recognition of the validity of a marriage contracted in another state, which is not authorized by the law of the domicil, and which permanently affects the relations and the rights of two citizens and of others to be born.

Mr. Justice Story, in his Commentaries on the Conflict of Laws, after elaborate consideration of the authorities, arrives at the conclusion that " in regard to questions of minority or majority, competency or incompetency to marry, incapacities incident to coverture, guardianship, emancipation, and other personal qualities and disabilities, the law of the domicil of birth, or the law of any other acquired and fixed domicil, is not generally to govern, but the *lex loci contractûs aut actûs*, the law of the place where the contract is made, or the act done ; " or as he elsewhere sums it up, " although foreign jurists generally hold that the law of the domicil ought to govern in regard to the capacity of persons to contract; yet the common law holds a different doctrine, namely, that the *lex loci contractûs* is to govern." Story Confl. §§ 103, 241. So Chancellor Kent, although in some passages of the text of his Commentaries he seems to incline to the doctrine of the civilians, yet in the notes afterwards added unequivocally concurs in the conclusion of Mr. Justice Story. 2 Kent Com. 233 note, 458, 459 & note.

In *Pearl* v. *Hansborough*, 9 Humph. 426, the rule was carried so far as to hold that where a married woman domiciled with her husband in the State of Mississippi, by the law of which a purchase by a married woman was valid and the property purchased went to her separate use, bought personal property in Tennessee, by the law of which married women were incapable of contract-

ing, the contract of purchase was void and could not be enforced in Tennessee. Some authorities, on the other hand, would uphold a contract made by a party capable by the law of his domicil, though incapable by the law of the place of the contract. *In re Hellmann's Will*, and *Saul* v. *His Creditors*, above cited. But that alternative is not here presented. In *Hill* v. *Pine River Bank*, 45 N. H. 300, the contract was made in the state of the woman's domicil, so that the question before us did not arise and was not considered.

The principal reasons on which continental jurists have maintained that personal laws of the domicil, affecting the status and capacity of all inhabitants of a particular class, bind them wherever they may go, appear to have been that each state has the rightful power of regulating the status and condition of its subjects, and, being best acquainted with the circumstances of climate, race, character, manners and customs, can best judge at what age young persons may begin to act for themselves, and whether and how far married women may act independently of their husbands ; that laws limiting the capacity of infants or of married women are intended for their protection, and cannot therefore be dispensed with by their agreement; that all civilized states recognize the incapacity of infants and married women ; and that a person, dealing with either, ordinarily has notice, by the apparent age or sex, that the person is likely to be of a class whom the laws protect, and is thus put upon inquiry how far, by the law of the domicil of the person, the protection extends.

On the other hand, it is only by the comity of other states that laws can operate beyond the limit of the state that makes them. In the great majority of cases, especially in this country, where it is so common to travel, or to transact business through agents, or to correspond by letter, from one state to another, it is more just, as well as more convenient, to have regard to the law of the place of the contract, as a uniform rule operating on all contracts of the same kind, and which the contracting parties may be presumed to have in contemplation when making their contracts, than to require them at their peril to know the domicil of those with whom they deal, and to ascertain the law of that domicil, however remote, which in many cases could not be done

without such delay as would greatly cripple the power of contracting abroad at all.

As the law of another state can neither operate nor be executed in this state by its own force, but only by the comity of this state, its operation and enforcement here may be restricted by positive prohibition of statute. A state may always by express enactment protect itself from being obliged to enforce in its courts contracts made abroad by its citizens, which are not authorized by its own laws. Under the French code, for instance, which enacts that the laws regulating the status and capacity of persons shall bind French subjects, even when living in a foreign country, a French court cannot enforce a contract made by a Frenchman abroad, which he is incapable of making by the law of France. See Westlake, §§ 399, 400.

It is possible also that in a state where the common law prevailed in full force, by which a married woman was deemed incapable of binding herself by any contract whatever, it might be inferred that such an utter incapacity, lasting throughout the joint lives of husband and wife, must be considered as so fixed by the settled policy of the state, for the protection of its own citizens, that it could not be held by the courts of that state to yield to the law of another state in which she might undertake to contract.

But it is not true at the present day that all civilized states recognize the absolute incapacity of married women to make contracts. The tendency of modern legislation is to enlarge their capacity in this respect, and in many states they have nearly or quite the same powers as if unmarried. In Massachusetts, even at the time of the making of the contract in question, a married woman was vested by statute with a very extensive power to carry on business by herself, and to bind herself by contracts with regard to her own property, business and earnings, and, before the bringing of the present action, the power had been extended so as to include the making of all kinds of contracts, with any person but her husband, as if she were unmarried. There is therefore no reason of public policy which should prevent the maintenance of this action.

*Judgment for the plaintiffs.*