*37 Vroom.*                Thompson v. Taylor.

ANDREW THOMPSON, PLAINTIFF IN ERROR, v. LILLIAN B. TAYLOR, DEFENDANT IN ERROR.

Argued March 5, 1901—Decided June 17, 1901.

1. The written promise of a married woman, domiciled in New Jersey, to pay a sum of money to the order of her husband, signed by her at her domicile and carried by him, with her acquiescence, to New York, and there endorsed and delivered in exchange for other notes of like import, is a contract made in the State of New York; and the capacity of the wife to bind herself by a contract of suretyship is to be determined by the law of that state.

2. Such a contract, if valid in the State of New York, may be enforced against the married woman in this state, although such contract, if made here, would be void.

3. The statute of New Jersey that regulates the right of married women to make contracts of suretyship is not a declaration of a public policy that closes the courts of this state to rights of action arising in other jurisdictions where the law is different.

On error to the Bergen Circuit.

This action was brought in the Circuit Court upon a note, of which the following is a copy:

"$422.29.                        ENGLEWOOD, N. J., Oct. 10, 1898.

"Three months after date I promise to pay to the order of W. Bernard Taylor four hundred twenty-two 29-100 dollars, at 44 Broad St., New York City, value received.

"LILLIAN B. TAYLOR.

"(Endorsed)   W. BERNARD TAYLOR, 44 Broad St."

The note was signed by Lillian B. Taylor at the time and place of its date, she being then the wife of the payee. She signed it at her husband's request and solely for his accommodation, and delivered it to him without any express limitation on the use he might make of it. The husband at once took the note to New York City and there transferred it, with his endorsement, to the plaintiff, to take up two similar notes held by him and then past due, aggregating, with interest, the amount of this note, which two notes the defendant had signed under the same circumstances, and which her husband had transferred to the plaintiff in the same manner for cash. The plaintiff knew that the payee and maker were husband and wife, but had no further notice, outside of the notes themselves, of the circumstances under which they had been signed.

The husband and wife have been during all the time above referred to, and still are, domiciled in New Jersey.

Since 1892 the statutes of New York have provided that "A married woman may contract with her husband or any other person, to the same extent, with the like effect, and in the same form as if unmarried, and she and her separate estate shall be liable thereon, whether such contract relates to her separate business or estate, or otherwise, and in no case shall a charge upon her separate estate be necessary."

Deeming the case one of doubt and difficulty, the Bergen County Circuit Court certified the foregoing facts to the Supreme Court for its advisory opinion on the question whether, on those facts, the plaintiff is entitled to judgment against Lillian B. Taylor for the sum mentioned in the note and interest.

The Supreme Court, after hearing argument, advised the Circuit Court that the plaintiff was not entitled to judgment

against Lillian B. Taylor upon the note in suit. Judgment in accordance with this advisory opinion was thereupon entered by the Circuit Court against the plaintiff, who, by writ of error, removed that judgment into this court.

For the plaintiff in error, *Raymond P. Wortendyke* and *Charles L. Corbin.*

For the defendant in error, *George W. Betts, Jr.*

The opinion of the court was delivered by

GARRISON, J. The note in suit was not a New Jersey contract. The parties to it in this state were husband and wife. By force of section 14 of our Married Women's act there is in this state no law to enable husband or wife to contract with each other, excepting as at common law. *Gen. Stat., p.* 2015; *Woodruff* v. *Apgar,* 13 *Vroom* 198; *Turner* v. *Davenport,* 47 *Atl. Rep.* 766. Hence the written promise of the wife to pay a sum of money to the order of her husband, signed by her and delivered to him in the State of New Jersey, did not constitute a contract. When, therefore, the note left this state no legal contract was in existence. *National Bank of Rahway* v. *Brewster,* 20 *Vroom* 231. In New York the above-mentioned feature of the common law rule has been expressly superseded by an enabling act that empowers a married woman to contract with her husband to the same extent and in the same form as if unmarried.

The husband, therefore, having in his possession, in the State of New York, his wife's note, entrusted to him under the circumstances certified in this case, had the means of making for her a contract of suretyship that would be valid by the law of the place where it came into legal existence and where it was to be performed. By his endorsement and delivery of the signed note the wife was as effectually bound to the payee as if she had personally executed the note in the State of New York.

Where a note is signed in this state, but is passed away and comes first into legal existence in the State of New York,

in contemplation of law it was made in the latter jurisdiction. *Campbell* v. *Nichols,* 4 *Vroom* 82. The note, therefore, is a contract made in the State of New York, upon the facts certified, without reference to the legal rule that a note made payable at a particular place is to be treated in all respects as if made at that place, for which abundant authority is cited in the brief of the plaintiff's counsel.

To the next proposition of the plaintiff, viz., that such a contract made in New York and valid by its laws will be enforced by the courts of New Jersey, two objections are raised— *first,* that the incapacities of a wife, under the common law, if not removed by the statute law of her domicile, follow her wherever she goes, so that if at home she be unable to bind herself as surety, she may nowheres bind herself by such a contract; *secondly,* that the retention in our law of so much of the common law as prevented married women from becoming sureties is a declaration by the legislature of a public policy, to which the courts should give effect by refusing to enforce obligations of this nature incurred by its citizens in other states where this disability no longer exists.

Both of these points are taken in the brief of counsel for the defendant, and each of them receives some support from the opinion delivered in the Supreme Court, although the actual decision of the case is rested upon the second ground, viz., that of public policy.

It will be necessary, therefore, to consider each of these propositions. The first claim is that the capacity of a married woman to make a contract of suretyship is governed by the law of her domicile, and not by the law of the place where the contract is made and where it is to be performed. In other words, that capacity to contract is governed by the law of domicile, and not by the *lex loci contractus.* The discussion of this question by the civilians and in early judicial writings occupied much space and received the closest attention from Mr. Justice Story as one in which the doctrines of the civil law could not be made to harmonize with the commercial rule upon the subject. It is rarely worth while to search back of Story upon such a question, especially if he has decided

against the civil law rule. In his "Commentaries upon the Conflict of Laws," after a comprehensive review of the authorities, Mr. Justice Story reached the conclusion that, in regard to the incapacities incident to coverture and other personal disabilities to contract, "the laws of the domicile of birth or the law of any other acquired and fixed domicile is not generally to govern, but the *lex loci contractus aut actus,* the law of the place where the contract is made or the act done." *Story Confl. L.* 103.

In the course of his consideration of this and kindred questions Mr. Justice Story quotes so frequently from the civilians that, upon a hasty reading, the opinions of those jurists may be taken for his own, but there can be no question as to the commentator's final summary, viz., that "although foreign jurists generally hold that the law of domicile ought to govern in regard to the capacity of persons to contract, yet the common law holds a different doctrine, namely, that the *lex loci contractus* is to govern." *Story Confl. L.,* § 241.

With respect to another American commentator, Chancellor Kent, it is both interesting and important to observe that, while in some parts of the text of his commentaries he seems to favor the arguments of the foreign jurists, yet in his later notes he unequivocally states the rule to be: "The state and condition of the person, according to the law of his domicile, will generally, though not universally, be regarded in other countries as to acts done or rights acquired, or *contracts made in the place of his native domicile;* but as to acts, rights, or contracts done, acquired or made out of his native domicile, the *lex loci* will generally govern with respect to his capacity and condition." *2 Kent Com.* 233 *(note c).*

To the same effect is the opinion of Chief Justice Gray, of Massachusetts, delivered in the case of *Milliken* v. *Pratt, 125 Mass.* 374, where, after considering the whole question, he decides that "the validity of a contract, even as regards the capacity of the parties, is to be determined by the law of the state where it is made."

I have no difficulty in reaching the conclusion that the capacity of Mrs. Taylor to enter into a New York contract in

New York was governed by the laws of New York, notwithstanding her domicile was in New Jersey; and that the contract into which she there entered was valid and binding upon her.

If we pass to the reason assigned in the advisory opinion we shall see that it rests upon the doctrine of our courts: That a contract valid elsewhere will not be enforced if it is inconsistent with the public policy of the jurisdiction the aid of whose tribunals is invoked for the purpose of giving it effect.

The decisive portion of the opinion of Mr. Justice Gummere is in these words: "When the legislature has declared the policy of the state in relation to a given subject-matter, it is the duty of the courts to give effect, so far as possible, to that policy," citing *Felt* v. *Felt*, 14 *Dick. Ch. Rep.* 606, and *Union Locomotive Co.* v. *Erie Railway Co.*, 8 *Vroom* 23.

There can be no doubt as to the duty of our courts under the condition thus predicated. The question in the case is whether the legislation referred to in the opinion is a declaration of public policy. Briefly summarized, that legislation confers upon married women rights to contract as if unmarried, save as to contracts of suretyship from which no benefit is obtained from their separate use. *Gen. Stat., p.* 2017, § 26.

In my judgment this and kindred acts of legislation, constituting together our Married Women's act, and passed under the titles of "An act for the better securing of the property of married women" and "An act to amend the law relating to the property of married women," are to be regarded as regulations rendered necessary by the abrogation of the principles of the common law concerning coverture; and that what is indicated by this legislation, as a whole, is the abandonment of a public policy upon the subject and the future regulation of it by acts of legislative discretion.

The distinction between regulative legislation and the adoption of a principle of public law is too important to be lost sight of. To declare, as the common law did, that the welfare of society required that wives be incapable of making contracts, is an illustration of the adoption of a principle which, so long as it was adhered to, constituted a rule of public policy. When, however, civilized states became satis-

fied that the welfare of society was not best served by the maintenance of this principle, it was abandoned, by the recognition of its opposite, viz., that married women possessed capacity to contract. The questions that then arose, viz., what contracts might they make, and what might they not, while calling for the exercise of legislative discretion, based upon considerations that affected a large class of individuals, did not, either in theory or in fact, involve any principle upon which the general welfare of the body of citizens of the state was assumed to rest. With the abandonment of the political principle, the matter was broken up into discretionary exercises of legislative regulation, in the course of which different bodies, or the same legislative body, at different periods, might lay down varying rules without destroyng that comity that is so essential to commercial confidence and intercourse. Thus in the case certified it appears that the State of New York, having abandoned the principles of the common law, as we ourselves have done, has gone further in its enabling legislation, or what is the same thing, has retained less of what the common law rule compelled, but equally and in either case the only principle involved has been abandoned. The respective regulations of the subject equally rest upon the common ground that women have a capacity to make contracts, subject to legislative control. If this be so,' comity requires that we mutually give effect to these discretionary acts by recognizing the validity of the resulting contracts and enforcing them in our courts, even when they are in opposition to our own declared discretion upon the subject. This, as I read the case of *Wright* v. *Remington,* 12 *Vroom* 48, has been categorically decided in our Supreme Court. In that case a wife signed two notes as surety for her husband in Illinois, where the common law had been abrogated to that extent. Suit was brought in our Circuit Court to enforce these contracts against the wife. Upon a case certified the Supreme Court held that comity required the enforcement of the notes in question.

In delivering the opinion of the court Mr. Justice Reed said: "There can be no question but that the contract was valid by the law of Illinois. It is, therefore, the duty of the

courts of this state to recognize and enforce it, unless it appears injurious to the interests of the state or of our citizens. *But nothing approaching this result can be deduced solely from the fact that the foreign state confers upon married women the power to make a contract of suretyship.* * * * Whatever may be our opinion of the policy of legislation beyond our state, we are bound by the principles of comity to recognize its validity, unless it clearly contravenes the principles of public morality, or attacks the interests of the body of the citizens of our state."

Objection upon this point was apparently not renewed upon the writ of error in this court, for the judgment was here affirmed without again referring to it. *Remington* v. *Wright*, 14 *Vroom* 451.

This case, upon the point now in controversy, states the correct rule of law so definitely that it should have been followed in the Supreme Court.

If, as was suggested upon the argument, the device of providing a place of performance in a foreign jurisdiction, or even of making the actual contract in a place where the wife was empowered to contract directly with her husband, should be urged as a ground for sustaining such a contract here, or for enabling the husband to sue thereon in our courts of law, a different question would be presented. It may well be that such a proceeding would run athwart the settled policy of our law with respect to the supervision exercised by equity over the engagements of married persons, which is retained in our system of jurisprudence by the fourteenth section of the Married Women's act. With respect to this question no opinion is expressed.

For the reasons given the judgment of the Circuit Court, entered in accordance with the advisory opinion of the Supreme Court, is reversed.

*For affirmance*—THE CHANCELLOR, KRUEGER, VROOM.     3.

*For reversal*—DIXON, GARRISON, COLLINS, FORT, GARRETSON, HENDRICKSON, BOGERT, ADAMS, VREDENBURGH, VOORHEES.     10.