(66 Misc. Rep. 550.)

## HAMMERSTEIN v. SYLVA.

(Supreme Court, Special Term, · New York County, March, 1910.)

1. CONTRACTS (§ 2*)—WHAT LAW GOVERNS—CAPACITY TO CONTRACT.

    The capacity of an operatic singer, domiciled in the United States, to contract for services in the United States, is governed by the laws of that country, where the contract was made in France.

    [Ed. Note.—For other cases, see Contracts, Cent. Dig. § 41; Dec. Dig. § 2.*]

2. HUSBAND AND WIFE (§ 82*)—CONTRACTS OF WIFE—VALIDITY.

    Under the French law, the wife of an American citizen, who has lived apart from her husband for four years, and supported herself on his failure to support her, may make a valid contract in France for her services as a singer without the consent of her husband.

    [Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. § 324; Dec. Dig. § 82.*]

3. INJUNCTION (§ 60*)—OPERATIC SERVICES—REFUSAL TO PERFORM.

    Where the services of an operatic singer are extraordinary, an injunction may be granted to prevent her singing for any other manager than the one with whom she has contracted to sing.

    [Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 117–119; Dec. Dig. § 60.*]

Action by Oscar Hammerstein against Marguerita Sylva. Judgment for plaintiff.

Judgment reversed, 122 N. Y. Supp. 276.

Dittenhoefer, Gerber & James, for petitioner.

Nathan Burkan, for respondent.

GERARD, J. On July 1, 1909, Hammerstein, the plaintiff, operatic impresario, entered into a contract in Paris with Marguerita Sylva, singer, the defendant. By this contract Hammerstein hired Marguerita Sylva for his season of opera 1909–10, beginning October 30, 1909, for 30 weeks, at a salary of $200 per week for 11 weeks and $250 per week for 20 weeks, she to sing in opera or opera comique and in concerts in the Manhattan Opera House, New York, Philadelphia Opera House, or in any opera house or hall in the United States of which Hammerstein might be manager. This contract contained a negative covenant which provided that Marguerita Sylva agreed not to sing under any other management than that of Hammerstein. She acknowledged that her dramatic and vocal abilities

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

were unique, and she gave Hammerstein the right to obtain an injunction in case she broke the contract. Here it may be material to decide that, if her services are not unique and extraordinary, the contract could not make them so; nor is the fact that she gave Hammerstein the right to injunctive relief material, if in fact he is not entitled to such relief. The defendant thereafter came to the United States and sang the leading soprano rôle in "Carmen" in plaintiff's opera house about September 2, 1909. On November 21st she sang the principal rôle of Nedda in Pagliacci, but since that time has refused to sing for the plaintiff. She has entered the employ of one Russel, and is singing under his management. Plaintiff asks an injunction to restrain her from singing for any other manager.

For answer to plaintiff's application, defendant contends that under the laws of France a contract made by a married woman without the consent of her husband is void, that this contract was made in France, that at the time she was a married woman, and that therefore the contract is void and cannot bind her. She also alleges that plaintiff broke his contract with her, first by not paying her, and, second, that the conduct of the plaintiff and his son toward her was such that she was justified in breaking the contract. As to the question of payment, whatever disputes the parties may have had, it is unquestioned that for the number of weeks she was in plaintiff's employ she has received more than the amount of money contracted to be paid her. What the money was called, whether salary or advance, is immaterial. The fact remains that she received the money. The alleged insulting conduct of plaintiff and his son consisted, as defendant alleges, in the fact that, when she appeared in the part of Nedda, plaintiff's son complained in strong language of her appearance in a blonde wig. She also alleges that plaintiff charged her with improper conduct. Plaintiff denies defendant's version of the wig incident, and denies that he charged defendant with maintaining improper relations with men. But whether these alleged criticisms of defendant's wigs or morals were such as to justify her in abandoning her contract does not seem material, in view of the letter written by the defendant to Hammerstein after the date of the alleged occurrences. This letter reads as follows:

"Nov. 28, 1909.

"My Dear Mr. Hammerstein: In view of our friendly interview of last Friday, and of your assurance that I shall be properly featured and receive cordial treatment hereafter, I shall be pleased to continue under the contract. I am very glad that our differences have been amicably arranged, as I feel certain that the result will be mutually beneficial.

"With kind regards,                    Marguerita Sylva."

Of course, no woman who had been accused of maintaining improper relations with men could, shortly after the charges were made, write such a letter to the man who had made the charges. It is probable that the real grievance of defendant was that plaintiff did not "feature" her as she desired, and had suggested that she sing the secondary rôle in the opera of Griseldis.

To come, then, to the law of the case: This contract, although made in Paris, was by its terms to be performed entirely in the United States. Defendant is a married woman. Her husband is a citizen of

the United States, but for four years has resided in Paris. The defendant does not live with her husband, and has not lived with him for four years, and defendant alleges that by French law she cannot contract without her husband's consent. Under these circumstances, which law determines the validity of the contract—the law of the place where it was made, or the law of the place where it is to be performed? Or is the capacity of parties to contract to be determined by the law of their domicile? Story, in his Conflict of Laws, says (page 280):

"But where the contract is either tacitly or expressly to be performed at some other place (than the place of contract), then the general rule is in conformity to the presumed intention of the parties, and the contract as to its validity, nature, obligation, and interpretation is to be governed by the place of performance."

The Court of Appeals of the state has stated this principal in Manhattan Life Ins. Co. v. Johnson, 188 N. Y. 113, 80 N. E. 660, 9 L. R. A. (N. S.) 1142:

"The general rule of law in this state is that a 'purely personal contract is to be governed by the law of the place where by its terms it is to be performed.' * * * It has been the general rule that 'the validity, the nature, the interpretation, and the obligations of contracts are to be governed by the law of the place in which they are to be performed.'"

See, also, Dyke v. Erie R. R. Co., 45 N. Y. 113, 6 Am. Rep. 43.

In Union National Bank v. Chapman, 169 N. Y. 538, 62 N. E. 672, 57 L. R. A. 513, 88 Am. St. Rep. 614, the Court of Appeals said that:

"(1) All matters bearing upon the execution, the interpretation, and the validity of contracts, including the capacity of the parties to contract, are determined by the law of the place where the contract is made. (2) All matters connected with its performance, including presentation, notice, demand, etc., are regulated by the law of the place where the contract by its terms is to be performed. (3) All matters respecting the remedy to be pursued, etc., depend upon the law of the place where the action is brought."

It would therefore seem that the Court of Appeals in one case says that the validity of contracts is to be determined by the law of the place of performance, and in another case says that the capacity of persons to contract is included in the term "validity of the contract." In the Chapman Case Mrs. Chapman joined in the making of the note with her husband's firm. The note was dated in Alabama, but payable in Illinois. By Alabama law a wife could not become surety for her husband. The Court of Appeals held that Mrs. Chapman did not authorize the note to be discounted in Illinois, and that her contract to become a surety was complete when the instrument was signed and delivered to the payee, both of which events took place in Alabama. The question of domicile was no raised in the Chapman Case. I think that the Court of Appeals, in laying down general rules in the Chapman Case, did not intend to overrule the principle, often enunciated by it, that where there is a place of performance expressed in the contract the law of that place governs.

In Pritchard v. Norton, 106 U. S. 124, 1 Sup. Ct. 102, 27 L. Ed. 104, it was held that a contract is governed by the law with a view to which it is made, and that it is to be presumed, in the absence of

express declaration, that the parties had in contemplation a law according to which their contract would be upheld rather than one by which it would be defeated.

In Lloyd v. Guibert, 1 Q. B. 115, the court lays down the general rule as follows:

"It is, however, generally agreed that the law of the place where the contract is made is prima facie that which the parties intended or ought to be presumed to have adopted as the footing upon which they dealt, and that such law ought therefore to prevail, in the absence of circumstances in a different intention, as, for instance, that the contract is to be entirely performed elsewhere."

In Guefratte v. Young, 4 De G. & Sm. 217, a married woman domiciled in France entered into a contract in England which was substantially valid according to French law, but invalid according to English law, but the contract was not entered into in a manner prescribed by French law. It was held that the French law gave capacity to make the contract, but that the English law regulated the form of it, and that therefore the contract was valid. The question here is, what law determines the question of the capacity of the parties to contract, where the entire performance of the contract is to be in a jurisdiction other than that in which the contract was signed, and when the parties would be capable of contracting in the place where it is to be performed, and also where action is brought? Certain American cases (Pearl v. Hansbrough, 9 Humph. [Tenn.] 426; Milliken v. Pratt, 125 Mass. 374, 28 Am. Rep. 241; Thompson v. Ketcham, 8 Johns. 189, 5 Am. Dec. 332) hold that the law of the place where the contract is made determines the question of capacity; but in all these cases no place was especially appointed for the performance, and therefore the general rule applied that the validity of the contract is determined by the law of the place where made. In the Massachusetts case, however, the English doctrine of domicile was disapproved.

In Sottomayer v. Barros, 3 P. D. I. 5, it was held that the question of personal capacity to enter into a contract is to be decided by the law of domicile. The court said:

"That the personal capacity to enter into any contract is to be decided by the domicile."

Dicey in his Conflict of Laws (1908 Ed., p. 534) follows the rule, and I think the controlling decision is Matter of Cooke's Trusts, 56 L. J. Ch. 637. In that case an English woman domiciled in England entered into a contract in France. According to English law she was an infant, and the court held that her capacity to enter into the contract must be determined by the law of her domicile. If the courts of this country will not follow the established rule of the English common law, that the law of their domicile governs the capacity of parties to contract, then we find that the Court of Appeals of this state has said that the question of capacity is included in the term "validity" of the contract, and in a number of cases has said that the validity of a contract is to be determined by the law of the place of performance. I therefore hold that, as the domicile of the defendant was in the United States, which country was also the place of performance, her capacity

to enter the contract is not governed by French law, and that, as both by the law of her domicile and the law of the place of the performance of the contract she had capacity to enter into the contract without the consent of her husband, she is bound by its terms.

In any event I do not think the French law cited by defendant applies to this case. The husband of defendant is an American citizen. He is residing in Paris. It is alleged by plaintiff, and not denied by defendant, that defendant is living separate and apart from her husband, and has so lived for four years, because during that time the husband has failed to support or provide for her. I have examined the provisions of the French Code submitted by defendant, and find no provisions expressly making the contracts of a married woman void, if such contracts are made without the consent of her husband. Defendant submits, however, the case of Carpier v. Lambquin, decided in the Tribunal Civil de Premier Instance de la Seine, which holds that a married woman cannot make a valid contract for rendering services as an actress without the consent of her husband; but this case refers to another case, which holds:

"Nevertheless, this engagement would have been lawful if the married woman who had contracted alone, although married, lived in complete independence of the married state." Daloz, Jurisprudence Générale, 1853; Carpier v. Lambquin, and footnote referring to case decided in 1851.

The defendant also cites a case brought in the French courts by the husband of Réjane to annul a contract entered into by her with a manager. But in this case the husband failed in his action and the decision of the lower courts was sustained by the Court de Cassation. I am therefore constrained to find that by the French law contracts to sing of the wife, who has been for some time a singer, and is living independently of the husband and apart from him, are not void, although made without the husband's consent. Defendant alleges as a last defense that her services are not unique and extraordinary; that Hammerstein has many singers who can sing her parts. This argument was advanced in Philadelphia Ball Club v. Lajoie, 202 Pa. 210, 51 Atl. 973, 58 L. R. A. 228, 90 Am. St. Rep. 627, when it was claimed that defendant was only a ball player and could be replaced; but the court said that "he may not be the sun in the baseball firmament, but he is certainly a bright, particular star." In the case of George Edwards v. Cissy Fitzgerald, decided at Special Term in this department by Mr. Justice Barrett,[1] a dancer who received the modest salary of

[1] The opinion of Justice Barrett, handed down January 16, 1895, in the case of Edwards v. Fitzgerald, is as follows:

"The impression which I derived from certain statements of fact made upon the argument has been removed by a careful perusal of the papers. The affidavit of W. Clinton Moffatt (the treasurer of Mr. Daly's theater in this city), which was submitted after the argument, makes it quite clear that the defendant, notwithstanding the modest salary for which she contracted, is a performer of unusual merit. Her talents may not be so exceptional as to render it impossible to replace her. That, however, is not the criterion. The question is: Can she be readily replaced? The answer, upon the facts before me, must be in the negative. She has a charm peculiar to herself. By her grace, beauty, and artistic methods, she has become a special attraction.

£10 a week was restrained from rendering services to any other manager. It must be remembered that plaintiff has no adequate remedy at law; that defendant has violated a contract to the benefits of which, whatever they are, plaintiff is entitled; and therefore defendant will be restrained from singing for any manager other than the plaintiff. Settle order on notice.

Judgment for plaintiff.

The plaintiff would undoubtedly find it difficult to procure a substitute who would be likely to produce a similar impression upon the public.

"Under these circumstances, equity will not permit Miss Fitzgerald deliberately to violate her contract and thus leave the plaintiff to a barren remedy at law. Her excuses, I regret to say, are flimsy in the extreme. She declares that her understanding was that she was to perform only in the city of New York and the adjacent cities. This statement, however, is entirely at variance with the written contracts, which specify an American tour to terminate at San Francisco, with an Australian tour to follow. She was engaged 'as principal dancer,' and the plaintiff, in addition to her salary, was to pay her hotel and traveling expenses and 'to find all dresses.' This he has done. Miss Fitzgerald was thus given the opportunity, under his management and at his expense and risk, to win fame in this country. Having succeeded, she now proposes to disregard her legal duty and abandon her manager in the midst of his tour. The rule is well settled that, while equity cannot compel a singer, actor, or dancer to perform at his or her employer's theater, it can and will restrain performances elsewhere in violation of the contract.

"Formerly it was the rule that equity would enjoin only when the contract contained a negative covenant. But that doctrine no longer prevails. An agreement to play for a season or for a tour with a particular manager imports exclusive service. The negative covenant is necessarily implied. This was distinctly held in Montague v. Flockton, L. R. 16 Eq. 189, and in Duff v. Russell, 60 N. Y. Super. Ct. 80, 14 N. Y. Supp. 134; and it is good sense. For these theatrical enterprises are exceptions to the general rule with regard to ordinary contracts for work and labor. And the exception is strikingly illustrated in the present instance. The plaintiff is an English manager. He determined upon an important theatrical venture. He took a popular London play, selected there a company specially adapted to its successful production, and started therewith for this country. His engagements were numerous, and his investment of capital considerable. Is it not apparent that the success of his entire enterprise is dependent upon the fidelity of his employés, and—if that be wanting—upon the assurance that desertion will be checked by the strong arm of the law? 'In this instance,' as Mr. Waterman well says in his work on Special Performance (page 153), 'the weaker party is the employer and not the employé, who, if permitted to break his engagement, has the other in his power, and may at any time subject him to serious loss.'

"Both upon principle and authority, therefore, I think it clear that an injunction as prayed for must issue, with costs."