PALMER NATIONAL BANK *v.* VAN DOREN.

1. HUSBAND AND WIFE—BILLS AND NOTES—CONTRACTS.

Note executed and delivered in Illinois to bank by married woman domiciled in Michigan as surety for brother's indebtedness, and renewals thereof subsequently executed in Michigan and mailed to bank, *held,* Illinois contract; renewal note being continuation of original note.

2. SAME—CAPACITY OF MARRIED WOMAN TO CONTRACT—GOVERNING LAW—CONFLICT OF LAWS.

Law of place of contracting controls on question of capacity of married woman to contract.

3. SAME—VALID FOREIGN CONTRACT ENFORCEABLE IN MICHIGAN.

Note and renewals thereof executed by married woman domiciled in Michigan as surety for brother's indebtedness, constituting Illinois contract and valid in that State, is enforceable in Michigan.

4. EVIDENCE—PAROL TESTIMONY.

In action on promissory note given by married woman as surety for brother's indebtedness, maker could not show by parol testimony contemporaneous agreement varying terms of note.

5. BILLS AND NOTES—ACCOMMODATION NOTE—HUSBAND AND WIFE.

Note executed by married woman as surety for brother's indebtedness to bank was accommodation note as between her and brother, but not as between her and bank (2 Comp. Laws 1929, §§ 9274, 9278).

Appeal from Wayne; Brown (William B.), J., presiding. Submitted June 9, 1932. (Docket No. 5, Calendar No. 36,426.) Decided October 3, 1932.

Assumpsit by Palmer National Bank against Verla E. Van Doren on a promissory note. Judgment for plaintiff. Defendant appeals. Affirmed.

On conflict of laws as to capacity of married woman to contract, see annotation in 57 L. R. A. 513; 26 L. R. A. (N. S.) 764; L. R. A. 1916A, 1055; 18 A. L. R. 1516; 71 A. L. R. 744.

*Clark, Klein, Ferris & Cook (Sydney A. Jacobs* and *Joseph H. Parsons,* of counsel), for plaintiff.

*Edmund M. Sloman (Arthur H. Ratner,* of counsel), for defendant.

BUTZEL, J.  In 1925, George M. McCray owed the Palmer National Bank of Danville, Illinois, approximately $53,000, which included $2,400 due for interest and $7,400 representing his liability on indorsements of certain notes made by residents of Canada and discounted at the bank.  The bank informed McCray that the bank examiner had objected to the Canadian notes, which had been due for over a year. When the bank insisted upon the payments, McCray invoked the aid of his sister, Verla E. Van Doren, a married woman, defendant herein.  She resided in Michigan, and, in response to her brother's request, went to Danville, Illinois, for the very purpose of assisting him.  After a conference with the bank officials, who told her of the order of the bank examiner, she gave plaintiff her note for $9,800. Thereupon McCray's liability on the Canadian notes was discharged, and the notes were placed in an envelope, upon which defendant's name was written, and left with plaintiff for collection, the payments made thereon to be applied on defendant's note. Defendant claims that, when she signed the note for $9,800, she was assured by plaintiff's president, who died prior to the trial, that she would not be called upon to pay the note, that it was simply being substituted for the Canadian notes in order to satisfy the bank examiner.  We are not impressed with this claim, for, as the trial judge found, even if this were true and the testimony admissible, it would constitute an attempt to work a fraud upon the bank examiner,

Defendant returned to Michigan and mailed several renewals of her note to the bank. Several payments made on the Canadian notes were applied on defendant's obligation. The last renewal note for $9,082.75, dated April 1, 1927, at Danville, Illinois, became due October 1, 1927, at plaintiff bank. The renewal notes were prepared by plaintiff bank and mailed to defendant in Michigan. It is conceded that the amount of the note is correct, that defendant is a married woman and a resident of Michigan, and that under the laws of Illinois, a married woman may become a surety. When the $9,800 note was discounted by the bank, $7,337.59 was used to take up the Canadian notes, and the balance of $2,462.41 was credited by the plaintiff to the account of defendant's brother, George McCray, and used almost entirely to pay up the past-due interest owed by him to plaintiff. On defendant's refusal to meet the last renewal note, suit was brought by plaintiff in the Wayne circuit court. Defendant claims that plaintiff cannot recover because defendant is a married woman, and under the laws of Michigan cannot be held liable as a surety. She claims that the contract was made in Michigan, and that, therefore, the law of this State is applicable as the *lex loci contractus*, that in any event the *lex fori* is applicable in the present case, and that the public policy of Michigan is opposed to holding a woman responsible on a contract of suretyship, no matter where made. She further contends that plaintiff cannot recover because the note is an accommodation paper given for the benefit of the bank without consideration to plaintiff.

The contract is an Illinois contract. The law of the place of making, "or place of performance," rather than the law of the domicile of a married

woman, governs as to her capacity to contract. A renewal note is regarded as a continuation of the original note. *Molsons Bank* v. *Berman,* 224 Mich. 606 (35 A. L. R. 1289); *New Jersey Title G. & T. Co.* v. *McGrath,* 246 Mich. 553, 562. In *John A. Tolman Co.* v. *Reed,* 115 Mich. 71, we held a contract of guaranty dated in Illinois, signed in Michigan, and mailed to the guarantee in Illinois, where payments, if any, were to be made, was an Illinois contract. See Proposed Final Draft No. 2, § 336, and comment B thereunder of the American Law Institute Restatement of the Conflict of Laws. The law of the place of contracting controls on the question of the capacity of the parties to contract. *Bissell* v. *Lewis,* 4 Mich. 450; *Wheeler* v. *Constantine,* 39 Mich. 62 (33 Am. Rep. 355); *State Bank of Eldorado* v. *Maxson,* 123 Mich. 250 (81 Am. St. Rep. 196); *Millar* v. *Hilton,* 189 Mich. 635; *John A. Tolman Co.* v. *Reed, supra; Amos* v. *Walter N. Kelley Co.,* 240 Mich. 257; *Buckeye Commercial Savings Bank* v. *Protogere,* 250 Mich. 652.

The question whether the courts of this State will enforce a contract of suretyship made in a foreign State by a married woman and a resident of Michigan, when such foreign State permits a married woman to become surety, is one of first impression in this State. It has been frequently passed upon, however, by Federal courts and tribunals in many other States. Defendant relies on the case of *Union Trust Co.* v. *Grosman,* 245 U. S. 412 (38 Sup. Ct. 147), and decisions in a very few other States. The case of *Union Trust Co.* v. *Grosman, supra,* is against the great weight of authority in this country. See 18 Columbia Law Review, p. 482; 27 Yale Law Review, p. 816; Goodrich on Conflict of Laws, p. 217. In *Millar* v. *Hilton, supra,* liability was en-

forced against a married woman domiciled in Michigan on a note executed by her in Ontario as surety for her husband at a time when her domicile was in Ontario. In that case Mr. Justice Steere stated:

"It is also well settled in this State, in harmony with the prevailing rule elsewhere, that foreign contracts, when the subject of litigation in this jurisdiction, are to be given effect, interpreted, and the contractual rights of the contending parties determined according to appropriate statutes and decisions of the territory where the contract was entered into, unless by some provision of the contract it is manifest the parties have otherwise intended and agreed. *Douglass* v. *Paine,* 141 Mich. 485. The promissory note upon which the action is based is clearly a foreign contract without qualification, intended to be performed where made. It was negotiated, dated, signed, indorsed, delivered, and made payable in Toronto, Ontario, where all parties in interest then resided. It was not paid there or elsewhere. Actions upon commercial paper are transitory, and the creditor may pursue and sue the debtor in any State where his person or property can be found; but the contractual rights of the parties are tested by the law of the place of contract, as before stated."

The facts in this case differ somewhat from those in the instant case, in that defendant was domiciled in Ontario when the contract was made.

In *Thompson* v. *Taylor,* 66 N. J. Law, 253, 258 (49 Atl. 544, 54 L. R. A. 585, 88 Am. St. Rep. 485), the court said:

"The distinction between regulative legislation and the adoption of a principle of public law is too important to be lost sight of. To declare, as the common law did, that the welfare of society required that wives be incapable of making contracts, is an

illustration of the adoption of a principle which, so long as it was adhered to, constituted a rule of public policy. When, however, civilized States became satisfied that the welfare of society was not best served by the maintenance of this principle, it was abandoned, by the recognition of its opposite, viz., that married women possessed capacity· to contract. * * * (Quoting from an earlier New Jersey case.)

" 'There can be no question but that the contract was valid by the law of Illinois. It is, therefore, the duty of the courts of this State to recognize and enforce it, unless it appears injurious to the interests ·of the State or of our citizens. But nothing approaching this result can be deduced solely from the fact that the foreign State confers upon a married woman the power to make a contract of suretyship. * * * Whatever may be our opinion of the policy of legislation beyond our State, we are bound by the principles of comity to recognize its validity, unless it clearly contravenes the principles of public morality, or attacks the interests of the body of the citizens of our State.' ''

The whole question is so ably presented in *International Harvester Co.* v. *McAdam,* 142 Wis. 114 (124 N. W. 1042, 26 L. R. A. [N. S.] 774, 20 Ann. Cas. 614), that we have quoted the following excerpt from it:

"A contract under the foregoing is not, necessarily, contrary to the public policy of a State, merely because it could not validly have been made there, nor is it one to which comity will not be extended, merely because the making of such contracts in the place of the forum is prohibited, general statements' to the contrary notwithstanding. In *Milliken* v. *Pratt,* 125 Mass. 374 (28 Am. Rep. 241), the court remarked substantially, even a contract expressly prohibited by the statutes of the State in which the suit is brought, if not in itself immoral (the term 'immoral' being used in the broadest sense), is not, necessarily, nor usually, deemed so invalid that the comity of the State, as administered by its courts, will refuse to entertain an action under all circumstances to enforce it. There must be something inherently·bad about it, something shocking to one's

sense of what is right as measured by moral standards, in the judgment of the courts, something pernicious and injurious to the public welfare. In Greenhood on Public Policy, at page 46, cited by counsel, the following rule is deduced from the authorities cited:

" 'When a contract is valid under the public policy of the State where made, it will be enforced in another State, although the same would, by the statute laws of the latter State, be void, unless its enforcement would exhibit to the citizens of the State an example pernicious and detestable.'

"It will occur to one, on a moment's reflection, that the last foregoing rule could not be otherwise, else the doctrine that a contract valid at the place where made is valid and, generally speaking, enforceable everywhere, would be wholly nullified as to foreign contracts which would not be valid if made in the place enforcement is sought. The rule would be useless since, in every case of such a contract, it would never be enforceable except in the place where made. The correctness of the rule and the absurdity of the idea that every contract which, if made in the jurisdiction of the forum, would not be valid, cannot be enforced there, are so clear. * * * If there is any ground for saying that they are inherently harmful, it is referable, solely, to the ancient common-law rule of disability, the reason whereof reaching to the present, is but little more than a shadow, a rule which, in great part, was changed by legislation long ago. That such contracts are not to be regarded as inherently harmful, is evidenced by the fact that they are permitted by the written law of a large portion of the States and in most others legislation in that direction is progressive. It is further evidenced by the fact that they are recognized as not inherently bad by substantially all the courts of this country. The exceptions are not significant. This court, except as restrained by principle and the great weight of authority, is free to take its own stand, to declare for

this State what shall be, in the particular situation, its public policy, till the source for written law shall have acted in the matter. The court cannot say that such contracts are against public policy merely because they have not the sanction of the common law as we have seen. * * * How can the court say that it should be so classed, that it should be located within the broadest possible boundaries of the immoral, the inherently bad? Nearly all the common-law disabilities of women to contract have been removed. They can acquire and enjoy property and make all contracts necessary or convenient in that regard. They can, in equity, charge their property substantially at will. There is little left of a business nature which men can do that they cannot do. They have nearly all the rights of men, and some besides, and on all sides are making pressing claims with distinguished support for what is yet withheld not very firmly nor perhaps very logically. How can the ordinary business contract in question, so common among men of ordinary perceptions, be said to be contrary to any policy of this State heretofore, or which should now be, adjudged bad in the interest of good morals?''

To like effect are: *Law* v. *Smith,* 68 N. J. Eq. 81 (59 Atl. 327); *Bowles* v. *Field,* 83 Fed. 886; *Milliken* v. *Pratt,* 125 Mass. 374 (28 Am. Rep. 241); *Brigham* v. *Gilmartin,* 58 N. H. 346; *R. S. Barbee & Co.* v. *Bevins,. Hopkins & Co.,* 176 Ky. 113 (195 S. W. 154); *Meier & Frank Co.* v. *Bruce,* 30 Idaho, 732 (168 Pac. 5); *C. I. T. Corp.* v. *Sanderson,* 43 Fed. (2d) 985.

Defendant could not show by parol testimony a contemporaneous agreement varying the terms of the note. *Anderson* v. *Engard,* 236 Mich. 221. The note was an accommodation note as between defendant and her brother, George M. McCray, and was not such as between the bank and defendant under

the negotiable instruments law.   See 2 Comp. Laws 1929, §§ 9274, 9278.

The court properly found defendant liable for the amount of the note, together with interest, in the amount of $12,051.55.   The judgment is affirmed, with costs to plaintiff.

Clark, C. J., and McDonald, Potter, Sharpe, North, Fead, and Wiest, JJ., concurred.