FRANK H. HEBBLETHWAITE, Respondent, Appellant, *v.* CHARLES R. FLINT and WALLACE B. FLINT, Appellants, Respondents.

Second Department, December 6, 1918.

Bills and notes — negotiability of note made in foreign country and paid in currency of said country — partnership — suit for accounting of value of stock pledged as collateral — ascertaining value where such stock had been exchanged for government bonds — effect of increase of capital stock — inability to deliver pledged stock — pledgor released from duty to keep tender of payment on deposit — accounting for profits under paving contracts — effect of illegal gain on right to accounting.

A note made in Brazil, payable in its national currency, which was stabilized by a specific rate of exchange into British sterling, is negotiable.

If such a note be held not negotiable, a personal demand is necessary.

In a suit between partners to recover shares of the capital stock of a railway company in Brazil pledged by plaintiff to defendants to secure an indebtedness, together with the increase and earnings of said stock, or if defendants do not deliver said stock for an accounting of its value, it appeared that the government had purchased said stock and paid for the same in bonds. *Held,* that the ascertainment of the values exchanged, based on the property. and incumbrances, gave the true worth of the stock, notwithstanding the attempt to diminish its rightful proportion in the settlement so as to let the stock have but twenty-five per cent of its par value.

Since the capital stock had been doubled and the new issue was of value, the plaintiff's recovery was properly reduced to the proportion the shares bore to the new capital.

After it appeared that defendants could not deliver the pledged stock, having put it out of their control, the plaintiff was no longer bound to leave the amount tendered in payment of the debt on deposit.

Where in a suit for an accounting of defendants' receipts and disbursements in carrying out a contract for paving, which plaintiff had obtained under an agreement with the defendants by which they were to perform the contract and pay the plaintiff one-half of the profits thereof, the defendants come into court and account for their compensation and also for an increment based in part on an illegal gain, the plaintiff is not empowered to take the entire excess as magnified by such inflated voucher.

After such transactions are closed, even if they include illegal elements, an accounting may still be enforced.

CROSS-APPEALS by the plaintiff, Frank H. Hebblethwaite, and by the defendants, Charles R. Flint and another, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Kings on the 12th day of April, 1916, upon the report of a referee appointed to hear and determine the issues.

Defendants appeal from the whole of said judgment with notice of an intention to bring up for review an interlocutory judgment entered in said clerk's office on the 26th day of October, 1910, and also an order entered in said clerk's office on the 6th day of March, 1916, modifying the referee's report and overruling certain objections and exceptions thereto and confirming the report as modified.

Plaintiff appeals from so much of the judgment as modifies the report of the referee in certain particulars and gives notice of an intention to bring up for review the order entered in said clerk's office on the 6th day of March, 1916, in so far as it modifies the report of the referee.

*Howard R. Bayne,* for the plaintiff.

*Albert B. Boardman* [*Frederick Stewart* with him on the brief], for the defendants.

PUTNAM, J.:

Here are two causes of action: *First,* for an accounting of defendants' receipts and disbursements in carrying out three contracts for paving, which plaintiff had obtained from the State of Amazonas, Brazil, under an agreement with the defendants by which they were to perform the contract and pay the plaintiff one-half of the profits thereof; *second,* to recover 1,609 shares of the capital stock of the Manaos Railway Company, pledged by plaintiff to defendants to secure an indebtedness amounting at the time of a tender to defendants of such indebtedness to about $12,140, together with the increase and earnings of said stock, or, if defendants do not deliver said stock, for an accounting of its value.

The answer put in issue practically all of the facts alleged in the first cause of action, with a counterclaim of $59,000 damages sustained through the alleged losses from plaintiff's negligence and want of skill in not obtaining other paving contracts in Manaos, in conformity with the agreement.

As to the second cause of action, the answer admits the pledge of the stock, the tender by plaintiff of the sum of $12,140, the refusal of defendants to accept such tender or to return the stock and the notes which such pledge secured. It also admitted that said stock was not listed or dealt in on the exchange in New York.

As counterclaims to the second alleged cause of action, the defendants allege, *first,* an auction sale of said stock in New York after demand of payment of the indebtedness for which it was pledged, and notice to plaintiff of such contemplated sale, for $1,411.35 net, so that after crediting such indebtedness there remained a balance of $8,581.84, with interest; and, *second,* the counterclaim of $50,000 set up against the first cause of action. It asked an affirmative judgment of $58,581.84, with interest. Plaintiff replied denying such counterclaims.

The first trial was in plaintiff's favor, with a reference of

certain issues to a referee. An appeal taken from this inter-
locutory judgment was here affirmed (83 App. Div. 163).

Defendants' exceptions to the referee's report resulted in
a decision that plaintiff had a half share of these bonds of the
State of Amazonas of a par value in United States money
of $56,394.60. Plaintiff was, therefore, held entitled to $21,274
on the other count for paving contracts, also to one-half of
these bonds, or, in the alternative, that he recover the par
value thereof, or $28,197.30. Plaintiff also had costs amount-
ing to $3,460.99.

On appeal from this judgment this court held that the
defendants " should have been required to accept the tendered
payment of plaintiff's indebtedness to them, and to deliver
to him the bonds in their possession, received in exchange
for his stock;" that "a money judgment under this alleged
cause of action, upon the facts proven and found," should
not run for " the par value of the bonds — $40,225 American
money — in view of the fact that the only evidence upon
which value could be predicated was that of sales made at
from fifty to sixty per cent of such par value." (115 App.
Div. 597, 605 [1906].)

On the new trial the court at Special Term held that
contract No. 1 for paving (obtained by " retainer " of
one Regalado, an attorney, but a governmental official
when that instrument was signed) was opposed to public
policy and void; that the plaintiff, however, was entitled
to an accounting as to contracts Nos. 2 and 3, in the first
cause of action. On this appeal, this conclusion against con-
tract No. 1 is not contested. As to contracts Nos. 2 and 3
we have a finding that $11,066.77 was plaintiff's half of the
net profits.

On the hearing of defendants' exceptions to the referee's
report, the justice at Special Term allowed a credit of two
questioned payments aggregating fifty contos, and thereby
reduced plaintiff's half of these paving profits to $8,395.87.

The second cause of action, to recover the pledged stock
or its value, becomes the chief subject-matter of this appeal.

On December 14, 1895, plaintiff obtained a street railway
concession for certain routes in Manaos, with a contract for
pumping and other privileges. The government reserved the

right to take over such road at cost at the end of ten years. Plaintiff had also obtained a further concession of September 24, 1897. He then bought out his copartners, to whom he gave his notes for $100,000 in payment. He proceeded to New York and arranged a transfer of his concessions through one Ladd to defendants, which was followed by the formation of a corporation to go on and electrify this street railroad. This was the Manaos Railway Company, organized under the laws of New York, with an authorized capital stock of $700,000, one-half of which went for plaintiff's concession and the property in the old railroad. The rest of this stock, with $257,000 first mortgage bonds, went to defendants and others so as to raise funds to complete and electrify the road. This improvement was finished in 1899 but at a cost above the estimates. Notes of the Manaos Railway Company had been issued to provide more funds. Plaintiff had been general manager with a salary up to April 1, 1900, when he was dismissed upon the expiration of a six months' leave of absence with pay.

On July 2, 1898, the plaintiff had borrowed of defendants 56 contos of reis Brazilian, " payable at the rate of exchange of seven and one-half pence per milreis," for which he gave his demand note, made and delivered at Manaos, pledging therewith 2,222 shares of stock " of Manaos Railway Company, standing in my name, with power to vote on and represent said shares at any and all meetings of the said company. And with further power to Flint & Co. upon default in payment hereof, to sell or otherwise dispose of said shares or such portion thereof as may be necessary for the realization of the amount of this note with interest at the rate of six per cent per annum, without notice to me. And I hereby further pledge with Flint & Co. as collateral security for the payment of this note, a certificate of deposit dated Manaos, May 9th, 1898, said certificate evidencing a deposit of the sum of twenty contos of reis by me in the State Treasury of Amazonas, Brazil, as a guarantee of the execution of my contract for the Viacao Urbana e Suburbana of Manaos, with like power, upon default in payment of this note and interest. Value received."

Later the number of these shares as collateral was lessened,

so that when this controversy started, defendants held only 1,609 shares of stock as security.

It is contended that this note was not negotiable, because payable " in foreign currency of fluctuating value in the United States." Our Negotiable Instruments Law (Gen. Laws, chap. 50 [Laws of 1897, chap. 612], § 25; now Consol. Laws, chap. 38 [Laws of 1909, chap. 43], § 25) declares that the negotiable character of such an instrument is not affected by the fact that it " 5. Designates a particular kind of current money in which payment is to be made." Here the note was made in Brazil, payable in its national currency, which was stabilized by a specific rate of exchange into British sterling. It was negotiable by the law merchant. The case of *Thompson* v. *Sloan* (23 Wend. 71) held not negotiable a note given in Buffalo but payable in Canadian money. That cannot apply to notes made abroad, which incidentally come before our courts.

If this note be held not negotiable, a *personal* demand on plaintiff would be necessary.

The railroad company encountered difficulties, and in April, 1900, the State of Amazonas made a formal demand that the corporation extend the road into Rua Nazareth. The Governor had asked that this extension be completed before his term expired in July. Mr. Walker, a local representative, accordingly wrote to plaintiff on April twentieth: " Under the concession we are compelled to honor the demand of the Government for extensions. To do this it will be necessary to obtain fresh capital. From whom and under what conditions is a problem, in view of the situation as set forth in my letter of even date." The letter of even date set out a financial statement from November to February, resulting in a deficit of $2,450.44. The company had never paid any dividends.

This letter concluded: " With an empty Treasury and nine months intervening before the Treasury will commence to get any moneys from duties on the next rubber crop, and a lien of 10,500 Contos in Treasury notes hanging over next season's revenue, what could any man of common sense think of the situation? There is absolutely no getting around the fact — a forced sale of the road has got to be faced."

On January 22, 1901, the president issued a circular calling

the shareholders' attention to the state of the finances of the railroad company. He recommended an issue of second mortgage bonds with an increase of the capital stock from $700,000 to $1,400,000, so as to fund its floating debt then represented by $326,000 in notes. Its bonded debt was $300,000. The capital was thus increased to $1,400,000, with an issue of $400,000 second mortgage bonds, at a meeting of the stockholders held December 23, 1901.

In the meantime defendants had sought to foreclose this pledge, first by sending out the note and stock to Hong Kong but not reaching plaintiff there. Then followed a demand at the residence of plaintiff's mother and sister at Leeds, Eng., accompanied by a notice of an auction sale of the stock in New York on September 11, 1901 — which was afterwards adjourned to September 25, 1901 — when the stock was bid in at a dollar a share for defendants. Plaintiff's protests against this sale were by two letters of his attorney in New York, of September twenty-fourth and twenty-fifth.

The justice of the previous decisions, which had held this sale ineffective and voidable, cannot be questioned.

Plaintiff came to New York, and on March 6 and 7, 1902, tendered to defendants his indebtedness and demanded from them his stock and the notes that defendants then held. This was not accepted. Plaintiff then deposited the money — $12,140 — in the Bank of British North America, in New York, with a notice to defendants dated March 29, 1902, that this sum deposited, or so much thereof as would suffice to discharge plaintiff's indebtedness, would be paid to defendants upon surrender of these 1,609 shares and of all plaintiff's notes to defendants.

The condition of such tender, it will be seen, was the surrender of the 1,609 shares, with no reference to the increase of the company's capital, which had occurred the prior December.

Plaintiff next began this action.

In the meantime, in February, arrangements had been consummated to sell to the Amazonas government all the stock and bonds of this railway company for government bonds. The offer by defendant's representative to that government on February 3 was accepted on February 22, 1902. Eventually the stock and bonds were deposited by means of an arrange-

ment made by representatives of defendants, whereby the first mortgage bondholders were to get one hundred and twenty per cent, the second mortgage bondholders eighty per cent and the stockholders twenty-five per cent — all in these five per cent gold bonds of the State of Amazonas. In this deal, 12,423 out of 14,000 shares joined. There was a handsome profit. It is strongly argued that the value of the plaintiff's stock realized through this exchange should be taken at $40,225, as the proceeds of the stock put in at the rate of $25 a share in the above negotiation.

On the basis of a schedule of the company's property and liabilities, plaintiff claimed $116,170 as the value for this stock on the basis of the original capital of 7,000 shares.

The referee, however, allowed many deductions, by which he reached his reported value of $92,355. Therefrom he computed the value of a single share as $90.43, so that 1,609 shares amounted to $145,501.87.

There was introduced testimony from the officials of the State of Amazonas regarding the terms of this purchase. Porfirio Nogueira, its Secretary of State, testified under a commission that the government paid for the corporate property $1,721,565.70 besides a further payment of $178,955.30 for the government's overdue subsidy and other indebtedness. In the negotiations with defendants, Mr. Backus had cabled stating that all moneys due from the government to the railway were to go to him as commission, and added: "Also all received in excess of the £250,000 will retain as commission this is for other." Accordingly the referee figured the price realized as only £250,000, or $1,212,500. He, however, treated as assets belonging to stockholders these arrears thus paid, being $178,955.30, making the total realized value as.................................... $1,391,455 30

From this he deducted the com-
   pany's indebtedness as per state-
   ment in "basis of sale"........ $664,400
Accounts and notes.............. 94,000
                                               758,400 00

Net value for shareholders.............. $633,055 30

On basis of total of 7,000 shares, one share equals $90.43; on the basis of total of 14,000 shares, one share equals $45.21.

It is argued here that, even basing this upon the increased capital of 14,000 shares, this was an unrealizable value; that the securities actually received on this arrangement, giving this high priority to the railroad bonds, should have been the measure of this recovery.

The referee, however, was not limited to the ingenious scheme of distribution of the avails of the purchase so as to let the stock have but twenty-five per cent of its par value. An ascertainment of the values exchanged, based on the property and incumbrances, gave the true worth of this stock, notwithstanding the attempt to diminish its rightful proportion in the settlement. (*Billings* v. *Shaw*, 209 N. Y. 265; *Sage* v. *Culver*, 147 id. 241; *Jacobson* v. *Brooklyn Lumber Co.*, 184 id. 152, 162.)

This brings us to the legal effect of the doubled capital stock. Here was a large floating debt and a situation where cash loans, even at the high interest rate of twelve per cent, were becoming difficult. The legal acts of the railroad company made plaintiff's stock a fraction of the new enlarged capital. Had defendants complied with the tender of cash in the following March, plaintiff would have received 1,609 shares in the corporate capitalization of 14,000 shares. The increase was lawful, and one of the contingencies a stockholder must meet. The situation was made clear in the letters to plaintiff already quoted.

The Special Term has not decided (and apparently could not decide on these pleadings) that this issue of stock was without value. Hence the action of the justice at Special Term in reducing the recovery to the proportion the shares bore to the new capital was right.

It was also urged that plaintiff's tender was not made good; that either because of withdrawing the money from the Bank of British North America after the original deposit, or on the ground that defendants did not realize on this sale of stock until long after the tender, full interest should not have been allowed. After it appeared that defendants could not deliver the pledged stock, having put it out of their control,

Second Department, December, 1918.          [Vol. 185.

plaintiff was no longer bound to leave the tendered amount on deposit. This left the question of tender and the effect thereof to be settled on equitable principles, and it cannot be said that the referee erred in allowing interest as he did.

The final matter is the fifty contos credited by the learned justice at Special Term. This was presented as a credit on the paving contracts Nos. 2 and 3 by which the agent at Manaos made payments of twenty contos and thirty contos.

These paving contracts in plaintiff's name were finally adjusted by Mr. Backus, as substitute attorney for Mr. Miller, the original engineer in charge.

In Schedule 4 the second item is: " Paid to obtain increased measurement and final settlement, 30 contos."* Also in Schedule 6 is: " Deduct payment made to obtain increased measurement and final settlement, 20 contos."*

More than a superficial measurement was required. Compensation was to be according to cubic contents excavated. During the period of Mr. Miller's superintendence, provisional certificates had been issued monthly, on which the government made installment payments. These stopped, which ended further prosecution of the work. When Mr. Backus, representing the contractor, required a final measurement, he found a strange inertia in the government offices. " At that time the Public Works Department was not paying attention to anything. Everything was at a standstill. All kinds of excuses were made." Later two notes were then made in plaintiff's name and given to some third persons. Then there was a measurement and certification for 602 contos. The Special Term allowed the two credits, making the recovery on this accounting 552 contos, in which plaintiff participates.

Even if the initial part of this liquidation were contrary to law, the completed transaction, from which the present accounting is one step removed, is not open to attack in this manner.

This business of grading and street repairs was legal. Defendants come into court and account for their compensation. They account also for an increment, based in part on an illegal gain. But this did not empower plaintiff to take the

---

* The fractions in Brazilian reis are omitted.

entire excess, as magnified by such inflated voucher. Had part of this lawful compensation been paid out in forbidden ways, a different question would arise. After such transactions are closed, even if they include illegal elements, an accounting may still be enforced. (*Brooks* v. *Martin*, 2 Wall. 70; Pars. Part. [4th ed.] § 8, n. 1.) I think, therefore, the learned court at Special Term dealt rightly also with this matter.

I recommend, therefore, that the judgment appealed from be affirmed, without costs.

Present — THOMAS, MILLS, PUTNAM, KELLY and JAYCOX, JJ.

Judgment unanimously affirmed, without costs.