Bergen County Court of Common Pleas.

GIUSEPPE INCITTI, PLAINTIFF, v. LUIGI FERRANTE AND EDOARDO C. YULIANO, DEFENDANTS.

Decided February 14, 1933.

For the plaintiff, *Francis P. Oddo.*

For the defendants, *James A. Major* and *Joseph H. Gaudielle.*

Delmar, C. P. J.   This action was brought by the plaintiff against the defendants upon a promissory note alleged to have been made by the defendants for the sum of "15,400 Italian lires." The complaint does not allege any consideration for the note and concludes with a prayer for judgment against the defendants for said sum of 15,400 Italian lires, or its equivalent in lawful money of the United States. The note is dated at Hackensack, New Jersey, and is made payable at the Bank Italia Company, and neither the complaint nor the note sets forth the address of said company, so that the presumption, therefore, is that the note is payable in the State of New Jersey.

Defendants moved to strike out the complaint on the ground that the same does not set forth a cause of action; and in the argument on said motion they contended that the note in question is not negotiable and that the complaint, therefore, must allege a consideration, which it does not do.

Upon the argument the point made by defendants' counsel was that the note was not made for money, but for a commodity and that, therefore, there is no presumption that it was made upon a legal consideration. In support of this contention counsel cites *Thompson* v. *Sloan et al.,* 23 *Wend.* 71.

Whether the note in question is or is not negotiable must be determined by the laws of this state. *Story Confl. L.* (2d ed.), § 317; *Thompson* v. *Taylor,* 66 *N. J. L.* 253; 49 *Atl. Rep.* 544; *Campbell* v. *Nichols,* 33 *N. J. L.* 81.

The note in question is negotiable in form unless the provision for the payment of the sum named in Italian lire makes it non-negotiable. The Uniform Negotiable Instruments law of this state provides in article 1, section 1, subdivision 2, that an instrument to be negotiable "must contain an unconditional promise or order to pay a sum certain in money;" and in section 6, subdivision 5, it is provided that the negotiable character of an instrument is not affected by the fact that "it designates a particular kind of current money in which payment is to be made." The act further provides, article 2, section 24: "Every negotiable instrument is deemed *prima facie* to have been issued for a valuable consideration." And in title 4, article 1, section 196, "In any case not provided for in this act the rules of the law merchant shall govern." This law, with but few variations, has been adopted in all the states of the union and in Great Britain. "It was clearly the intention of the legislature in passing the Uniform Negotiable Instruments act to cover the whole subject relating to negotiable instruments," the purpose being to secure uniformity in the law in the several states relating to negotiable instruments. *Joyce Defenses to Commercial Paper* (2d ed.) 1386.

If it had been the intention of the legislature to provide that a note in order to be negotiable must be payable in

lawful money of the United States, or in legal tender, it would have been a simple matter to have used language appropriate for that purpose. The use of the words, "money and current money," indicate that such was not the purpose.

The question arises—what is money? Money is purely a legal institution; it is impossible without law. "Money is what the law or custom makes receivable for payments, taxes and debts." See *Delmar, The Science of Money* (*3d ed.*) 25, 46. "Money by itself is but a mere device. It has value only by law and not by nature. So that a change of convention between those that use it is sufficient to deprive it of its value and of its power to purchase our requirements." *Aristotle's Politica.*

What then does our law provide?

The constitution of the United States, article 1, section 8, provides that the "congress shall have power to coin money, regulate the value thereof, and of foreign coin," "and under the power vested in it by this section of the constitution the congress has from time to time established the value of foreign coins. It is a matter of common knowledge that foreign coins of various nations such as England, Spain, France, Portugal and Mexico, passed as currency in the United States prior to the civil war. (Sometimes as legal tender under acts of congress.) In fact, they constituted at that time, with the exception of the note issues of the state banks, the bulk of the currency then in circulation. The congress from the earliest times has fixed the values of various foreign coins by statute. One of these statutes, namely, act of August 27th, 1894, chapter 349, section 25, provides, 'The value of foreign coin as expressed in the money of account of the United States shall be that of the pure metal of such coin of standard value, and the values of the standard coins in circulation of the various nations of the world shall be estimated quarterly by the director of the mint and be proclaimed by the secretary of the treasury immediately after the passage of this act and thereafter quarterly on the 1st day of January, April, July and October in each year.' "

It is well established that a bill or note may be payable in the money of any country, that is to say in its coins, "such as guineas, ducats, louis d'ors, doubloons, crowns or dollars; or in the known currency of a country, as pounds sterling, livres, tournoises, francs, florins, &c.; for in all these cases the sum of money is fixed by the par exchange on the known denomination of the currency with reference to the par." *Story Bills*, § 43; *Daniell Neg. Inst.*, § 58; *Edw. Bills* 137, 138. See, also, *King* v. *Hamilton*, 12 *Fed. Rep.* 478, the material facts in which case are similar to those in the case at bar.

The law merchant is international in its character and was developed for the purpose of facilitating trade in commerce between different countries. It seems clear, therefore, that where a note is made payable in a country in the money or coins of another country, which money or coins have a value fixed by the law or under the authority of the law of the country where the note is payable, and which value can by a simple mathematical calculation be expressed in the value of the lawful money of the latter country, that such note by the rules of the law merchant and under the Uniform Negotiable Instruments act is negotiable. There is a scarcity of decisions in this country touching this question. The following cases, most of which have been cited by counsel for the plaintiff as authorities, bear on the point: *Black* v. *Ward*, 27 *Mich.* 193. In this case, however, the note was made in Michigan but was payable in Canada in Canada currency. It was decided that the note was payable in money and, therefore, negotiable. This can hardly be considered a precedent, because the note being payable in Canada was governed as to its negotiability by the law of that country, and, therefore, was payable in its own currency. *Hogue* v. *Williams*, 85 *Tex.* 553; 22 *S. W. Rep.* 580; 20 *L. R. A.* 481. The note in this case was made at Saltillo, in Mexico; no place of payment was specified but it was payable in one thousand Mexican silver dollars. The case was decided on the theory that Mexican silver dollars were recognized by the United States laws as money of the Republic of Mexico, and that, therefore, the note was negotiable; but since no

place of payment was specified the note should have been construed under the laws of Mexico, and since it was payable in Mexican money, it was not an authority on the point in question.

In *Thompson* v. *Sloan, supra,* decided in 1840, the note was made and dated at Buffalo, New York, in the year 1836, for $2,500, payable in Buffalo, "in Canada money." This case is cited by counsel for the defendants as authority for the point argued by them that a note payable here in the coin of a foreign country is not negotiable. The court said: "A promissory note must in order to come within the statute * * * be payable in money only, in current specie * * *; or, at least, in what we can judicially notice as equivalent to money. * * * Admitting that the note in question imports an obligation to pay in gold and silver current in Canada, I do not see on what principle we can pronounce it to be payable in money within the meaning of the rule. It is not pretended that coins current in Canada are, therefore, so in this state. As gold and silver they might readily be received and so might the coin of any foreign country, Germany or Russia for instance, but the creditor might, and in many cases doubtless would refuse to receive them because ignorant of their value. In law they are all collateral commodities like ingots or diamonds, which, though they might be received and be, in fact, equivalent to money are not yet goods and chattels. A note payable in either would, therefore, be no more negotiable than if it were payable in cattle or other specific articles. The fact of Canada coins being current here is not, at any rate, so notorious that we can judicially notice them as a universal customary medium of payment in this state, and if not, they are no more a part of our currency than Pennsylvania bank bills. * * * Nor do I perceive in the case any proof or offer to prove that such coins were of universal currency."

It must be borne in mind that at the time of this decision there was no country or province known as "Canada." "There were at that time the provinces of Upper Canada [Ontario], and the province of Lower Canada [Quebec], and it was not until the year 1841 that they were united into a

single province, and not until many years later that the present Dominion of Canada was formed. At that time and for many years afterwards there was no currency issued in Canada. Both English and American coins circulated. The standard was gold, but there were different methods of counting, namely, English currency, Halifax currency and Canadian sterling, the respective ratios being 100:120:108. So that even if the note were held to be payable in gold coin current in Canada there was no way to determine the weight and fineness of the coin.

"It must also be remembered that prior to the civil war the circulating medium of the United States consisted almost entirely of bank notes issued by numerous independent corporations variously organized under state legislation of various degrees of credit and very unequal resources. 'Acts of congress prohibited the receipt or disbursement in the transactions of the national government of anything except gold and silver and the laws of the states required the redemption of bank notes in coin on demand. There was no national currency excepting coin. There was no general regulation of any other by national legislation." *Veazie Bank* v. *Fenno,* 8 *Wall.* 539; 75 *U. S.* 482. The bulk of the currency circulating in New York in 1836 consisted of bank bills issued by various state banks and coins issued by the United States and a few foreign countries and the power of congress to issue paper currency had not then been determined. I do not, therefore, consider the decision in this case to be adverse to the contention of the plaintiff but rather as supporting it, especially so, as the court further stated, "this view of the case is not incompatible with a bill or note payable in money of a foreign denomination or any other denomination being negotiable, for it can be paid in our own coin of equivalent value to which it is always reduced by a recovery."

In *Hebblethwaite* v. *Flint,* 173 *N. Y. Supp.* 81, the note was made in Brazil and payable in the national currency of that country stabilized by a specific rate of exchange into British sterling. It is not stated where the note was payable. The court held that the note was negotiable by the law merchant, distinguishing this case from *Thompson* v. *Sloan,*

*supra,* because the note in this case was made abroad, the court saying, "that cannot apply to notes made abroad which incidentally come before our courts."

In the case of *Reisfeld* v. *Jacobs,* 176 *N. Y. Supp.* 223, involving a contract for the purchase of Russian bank notes, it was held that such notes were not money. The court said, "in view of the fact that these notes were issued by a government now defunct and that the United States at present has no relations with any government in Russia, the court cannot take judicial notice that these notes are backed by the credit of a responsible government or that they even pass current anywhere as money." The court, therefore, found that the contract in question was a contract for the sale of goods.

A year prior to this decision, however, the same court in the case of *Brown* v. *Perera,* 176 *N. Y. Supp.* 215, affirmed an opinion of a referee holding that "foreign money is not, in legal contemplation, a legal commodity or article of merchandise, but that it was money, the title to which was acquired by the innocent holder, even though he purchased it from one who had no title. As was said in the former case (Reisfeld *v.* Jacoby), the opinion in the latter case "concerns the question whether money issued under the authority of a *responsible* government and used generally for the purpose of convenient transaction is negotiable, and this has no application to the question presented in the case at bar."

The contract sued on here is a contract for the payment of money and not a commodity. It is also a contract for the payment of Italian lire and, therefore, within the purview of the act of 1879, *supra,* under which act the value of this foreign coin in money of the United States is established by the director of the mint and proclaimed by the secretary of the treasury. This note was made for a sum certain, because a note for any number of Italian lire is only another form of expression for the equivalent in dollars, which equivalent is now established under the authority of the legislation previously referred to. See *King* v. *Hamilton, supra.*

The motion to strike out the complaint is, therefore, denied.